## DETERMINED IN

# THE SUPREME COURT

## OF THE

# STATE OF CALIFORNIA.

[No. 9984. In Bank. —January 31, 1888.]

## SARAH ALTHEA SHARON, Respondent, v. F. W. SHARON, Executor, etc., of William Sharon, Deceased, Appellant.

Marriage — Agreement for — Promise to Keep Secret. — An agreement between a man and a woman to become husband and wife, made *per verba de præsenti*, is not invalidated by the fact that it contains a collateral promise by one of the parties not to make the marriage known until a future date, without the consent of the other.

Id. — Unsolemnized Marriage — Present Consent to Marry — Assumption of Marital Rights and Duties — Consummation. — Under section 55 of the Civil Code, it is not necessary to the validity of a marriage not attended by a solemnization that the present consent to marry should be followed by a *public* mutual assumption of marital rights and duties. A present consent to marry, followed by a consummation, is sufficient to constitute the marriage.

Id. — Divorce — Counsel Fees must be Made Payable to Wife. — Under section 137 of the Civil Code, the money necessary to enable a wife to prosecute or defend an action of divorce should be ordered paid by the husband directly to her, and the court has no power to order it paid directly to her attorneys.

Id. — Unreasonable Counsel Fees. — Under the circumstances of the case, the sum of fifty-five thousand dollars ordered to be paid by the husband to the wife's attorneys as counsel fees, *held*, excessive, and an abuse of the discretion of the court, and that the number of attorneys employed by the wife to prosecute the action was unnecessarily large.

LXXV. Cal.—1

ID. — AGREEMENT BY ATTORNEY TO ACT ON CONTINGENCY. — Pending an
action for divorce, the wife has no necessity entitling her to an allowance
for counsel fees, when her attorneys are faithfully and satisfactorily
acting for her in pursuance of an agreement whereby they have, as com-
pensation for their services, a contingent interest in the result of the
litigation.

ID. — ALIMONY — REASONABLENESS OF ALLOWANCE. — The action was brought
by a wife for a divorce, and the answer denied the marriage. On the
trial, the evidence showed that the marriage had been kept secret, and
that the defendant had agreed to pay the plaintiff five hundred dollars a
month for her support until the marriage should be openly acknowledged.
*Held*, that an allowance to the wife of an equal amount per month as
temporary alimony was reasonable, and that the allowance of a greater
amount was an abuse of discretion.

APPEAL from a judgment of the Superior Court of the
city and county of San Francisco, and from an order
for alimony and counsel fees.

The facts are stated in the opinion of the court.

*W. H. L. Barnes, Oliver P. Evans, William M. Stewart,
William F. Herrin, F. G. Newlands, S. M. Wilson, J. P.
Hoge, H. I. Kowalsky,* and *John Currey,* for Appellant.

The findings show that no marriage ever existed be-
tween the parties, as under the Civil Code a secret con-
tract to become husband and wife, followed by secret
sexual intercourse, does not constitute marriage. (Civ.
Code, sec. 55–57; Bishop on Marriage and Divorce, secs.
3, 439; *Graham* v. *Bennett,* 2 Cal. 503; *Taylor* v. *Swett,* 3
La. 33; 22 Am. Dec. 156; *Turpin* v. *Public Administrator,*
2 Bradf. 424; *Yardley's Estate,* 75 Pa. St. 211; *Cargile* v.
*Wood,* 63 Mo. 513; *Calef* v. *Calef,* 54 Me. 365; *Letters* v.
*Cady,* 10 Cal. 533; *Holmes* v. *Holmes,* 1 Saw. 125; *In re
Taylor,* 9 Paige, 611.)   Where there is a consent or an
agreement to be husband and wife, without solemniza-
tion, the consent does not constitute marriage under the
code, but it must be followed by the mutual assumption
of marital rights, duties, or obligations.   The mutual
assumption of marital rights, duties, or obligations must
mean at least an open and public recognition of each

other as husband and wife, a common dwelling, and ordinary social intercourse with others, as well as copulation. (*Honyman* v. *Campbell*, 2 Dow & C. 281; *Meister* v. *Moore*, 96 U. S. 79; *Dumaresly* v. *Fishly*, 3 A. K. Marsh. 1198; Bishop on Marriage and Divorce, sec. 252; *Archer* v. *Haithcock*, 6 Jones, 421; *Beaulieu* v. *Ternoir*, 5 La. Ann. 476; *Bissell* v. *Bissell*, 55 Barb. 325; *Betsinger* v. *Chapman*, 88 N. Y. 487; *Blasini* v. *Blasini*, 30 La. Ann. 1388; *Badger* v. *Badger*, 88 N. Y. 549; 42 Am. Rep. 263; *Cheseldine* v. *Brewer*, 1 Har. & 'McH. 152; *Donnelly* v. *Donnelly*, 8 B. Mon. 113; *Durand* v. *Durand*, 2 Sweeny, 315; *Ford* v. *Ford*, 4 Ala. 142; *Forney* v. *Hallacher*, 8 Serg. & R. 158; *Grotgen* v. *Grotgen*, 3 Bradf. 373; *Hill* v. *Hill*, 32 Pa. St. 513; *Hayes* v. *People*, 24 How. Pr. 452; *Hicks* v. *Cochran*, 4 Edw. Ch. 107; *Hyde* v. *Hyde*, 3 Bradf. 509; *Northfield* v. *Vershire*, 33 Vt. 110; *Taylor* v. *Swett*, 3 La. 34; *Trimble* v. *Trimble*, 2 Ind. 76; *Clark* v. *Cassidy*, 64 Ga. 662; *Dunbarton* v. *Franklin*, 19 N. H. 257; *Hill* v. *Burger*, 3 Bradf. 432; *Maryland* v. *Baldwin*, 112 U. S. 494; *Case* v. *Case*, 17 Cal. 598; *Hutchins* v. *Kimmell*, 31 Mich. 126; *Teter* v. *Teter*, 101 Ind. 134; *Starr* v. *Peck*, 1 Hill, 270; *Rose* v. *Clark*, 8 Paige, 574; *Cheney* v. *Arnold*, 15 N. Y. 345; *Grisham* v. *State*, 2 Yerg. 589; *Kopke* v. *People*, 43 Mich. 41; *Estate of Briswalter*, 72 Cal. 107.) The policy of the law of California prohibits secret marriages not accompanied by solemnization. (*Baker* v. *Baker*, 13 Cal. 95; Stewart on Marriage and Divorce, sec. 327; Act of April 20, 1850; *Wade* v. *Kalbfleisch*, 58 N. Y. 284; Act of April 26, 1858; *Holmes* v. *Holmes*, 1 Saw. 99; Civ. Code, secs. 70–76; *White* v. *Equitable M. B. Union*, 76 Ala. 251; 52 Am. Rep. 325; *Noel* v. *Ewing*, 9 Ind. 50; *Maguire* v. *Maguire*, 7 Dana, 184; *Abbe* v. *Marr*, 14 Cal. 211; *Valentine* v. *Stewart*, 15 Cal. 405.) The clause in the marriage contract providing for its secrecy is fatal to the marriage. (*State* v. *Walker*, 36 Kan. 297.) The marriage being denied by the answer, and not established by the findings, the court had no power to award

alimony or counsel fees. (*Vreeland* v. *Vreeland*, 18 N. J. Eq. 44; *Humphreys* v. *Humphreys*, 49 How. Pr. 140; *Herforth* v. *Herforth*, 2 Abb. Pr., N. S., 484; *Brinkley* v. *Brinkley*, 50 N. Y. 184; 10 Am. Rep. 460; *State* v. *Walker*, 36 Kan. 297.) The allowances for alimony and counsel fees were grossly excessive, and the order therefor was in several respects an abuse of that wise judicial discretion which ought to be exercised in all cases, and which was most especially called for in the present. Discretion is judicial, and not arbitrary, and is subject to review on appeal. (*Foss* v. *Foss*, 100 Ill. 576; *Foote* v. *Foote*, 22 Ill. 425; *Blake* v. *Blake*, 80 Ill. 523; *Stillman* v. *Stillman*, 99 Ill. 196; *Brinkley* v. *Brinkley*, 50 N. Y. 184; 10 Am. Rep. 460; *Rose* v. *Rose*, 53 Mich. 585; *Froman* v. *Froman*, 53 Mich. 581; *Hecht* v. *Hecht*, 28 Ark. 92; *Glenn* v. *Glenn*, 44 Ark. 46; *Lapham* v. *Lapham*, 40 Mich. 527; *Cox* v. *Cox*, 19 Ohio St. 502; 2 Am. Rep. 415; *Powell* v. *Powell*, 53 Ind. 513; *Sharon* v. *Sharon*, 67 Cal. 185; *Cooke* v. *Cooke*, 2 Phillim. 40; *Kempe* v. *Kempe*, 1 Hagg. Ecc. 532; *Hawkes* v. *Hawkes*, 1 Hagg. Ecc. 526; *McGee* v. *McGee*, 10 Ga. 477; *Amos* v. *Amos*, 4 N. J. Eq. 171; *Germond* v. *Germond*, 4 Paige, 643; *Hammond* v. *Hammond*, 1 Clarke, 153; *Coles* v. *Coles*, 2 Md. Ch. 341; *Little* v. *Little*, 63 N. C. 22; *Melizet* v. *Melizet*, 1 Pars. Cas. 77; 2 Bishop on Marriage and Divorce, sec. 458; *Williams* v. *Williams*, 29 Wis. 517.)

*D. S. Terry, Tyler & Tyler, Flournoy & Mhoon*, and *Walter Levy*, for Respondent.

Under the provisions of the Civil Code, in order to constitute an unsolemnized marriage it is not necessary that the present consent to marry should be followed by a public assumption of marital rights, duties, or obligations. (Civ. Code, secs 55–57; 1 Bishop on Marriage and Divorce, sec. 252; *Dalrymple* v. *Dalrymple*, 2 Hagg. Const. 54; *Brinkley* v. *Brinkley*, 50 N. Y. 184; 10 Am. Rep. 460; *Hamilton* v. *Hamilton*, 9 Clark & F. 327.) Neither the

provision in the marriage contract for keeping the marriage secret, nor the fact that it was kept secret, rendered the marriage illegal on supposed grounds of public policy. (*Londonderry* v. *Chester*, 2 N. H. 268; *Cannon* v. *Alsbury*, 1 A. K. Marsh. 76; 10 Am. Dec. 709; *Holmes* v. *Holmes*, 6 La. 463; 26 Am. Dec. 482; *Meister* v. *Moore*, 96 U. S. 76; *Dyer* v. *Brannock*, 66 Mo. 391; 27 Am. Rep. 359; Reeve's Domestic Relations, sec. 196; *Ferrie* v. *Public Adm'r*, 3 Bradf. 151; *Dumaresley* v. *Fishly*, 3 A. K. Marsh. 370; *Hutchings* v. *Kimmell*, 31 Mich. 127; *Pearson* v. *Howey*, 11 N. J. L. 17.)

McKinstry, J. — The appeals herein were taken in the lifetime of William Sharon, the original defendant. The first is from a judgment determining and declaring the validity of an alleged marriage of plaintiff and defendant, decreeing a divorce, and that plaintiff is entitled to one half of the community property. The second appeal is from an order directing the payment of counsel fees and alimony.

The court below found:—

"2. That on the twenty-fifth day of August, A. D. 1880, the plaintiff and defendant each signed a certain declaration of marriage, in the words and figures following, to wit:—

"'In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, Sarah Althea Hill, of the city and county of San Francisco, state of California, age twenty-seven years, do here, in the presence of Almighty God, take Senator William Sharon, of the state of Nevada, to be my lawful and wedded husband, and do here acknowledge and declare myself to be the wife of Senator William Sharon, of the state of Nevada.    Sarah Althea Hill.

"'August 25, 1880, San Francisco, Cal.

"'I agree not to make known the contents of this paper or its existence for two years, unless Mr. Sharon himself see fit to make it known.    S. A. Hill.'

" 'In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, Senator William Sharon, of the state of Nevada, age sixty years, do here, in the presence of Almighty God, take Sarah Althea Hill, of the city and county of San Francisco, California, to be my lawful and wedded wife, do here acknowledge myself to be the husband of Sarah Althea Hill.          WILLIAM SHARON. Nevada.

" 'August 25, 1880.'

"Which was the only written declaration, contract, or agreement of marriage ever entered into between said parties, and at the time of signing said declaration plaintiff and defendant mutually agreed to take each other as, and henceforth to be to each other, husband and wife.

"3. That afterward, and about the —— day of September, 1880, the plaintiff and defendant commenced living and cohabiting together in the way usual with married people, although their cohabitation was kept secret, and so continued for the space of more than one year, and down to the twenty-fifth day of November, 1881, and during all of said time the plaintiff and defendant mutually assumed toward each other marital rights, duties, and obligations.

"4. That during all the time plaintiff and defendant so lived together, defendant visited her relations with her, escorted her to places of amusement, and introduced her to respectable families and to members of his own family, and wrote to her several letters while absent from her, in which he addressed her as 'My dear wife.' "

"6. The defendant, on or about December 6, 1881, drove plaintiff from her apartments in his hotel, in which she had resided by his direction since September, 1880, and which was the residence selected for her by the defendant, refused to longer live with or provide for her support, and has not since then lived with or sought to live with, or requested the plaintiff to return or live with him, or provide in any manner for her support."

"8. That it is not true, as stated in the answer of de-

fendant, that plaintiff has either falsely or fraudulently assumed the name of Sarah Althea Sharon, but, on the contrary, that it is her real name; nor is it true that she, or any one, forged the document mentioned in the complaint and heretofore set out; on the contrary, the said document is genuine and was signed by the plaintiff and defendant at the time it purports to have been signed.

" 9. That defendant never introduced plaintiff as his wife, nor spoke of her as such in the presence of other persons; that plaintiff never introduced defendant as her husband, nor spoke to nor of him to other persons in his presence as her husband; that the parties were never reputed among their mutual friends to be husband and wife, nor was there at any time any mutual, open recognition of such relationship by the parties, nor any public assumption by the parties of the relation of husband and wife."

The appellant contends that, on the findings, the judgment declaring the validity of the marriage must be reversed, and a judgment be ordered that no marriage existed between the parties. This, because of the written promise of the plaintiff that the written declaration of marriage should, at the option of the defendant, be kept secret for the period of two years, and of the facts found showing that, while their cohabitation continued, the alleged marriage was not made known by the plaintiff or defendant to third persons.

The objection that the findings do not sustain the judgment is in the nature of a demurrer to the findings. The evidence is not before us, and we are not to inquire how far, if at all, the secrecy maintained by the plaintiff and defendant, or the insertion of the written promise of secrecy on her part, tended under the circumstances to prove *that no marriage was contracted.* That was a matter to be argued in the court below. Here, and on this appeal, the facts set forth in the findings are admitted to be true.

If the contemporaneous promise of the plaintiff not to make known the paper writing, or its contents, for a limited period, rendered the agreement of the plaintiff and defendant to take each other as husband and wife void, or if the parties could not, as matter of law, mutually assume marital rights, duties, or obligations, without making public their relation as husband and wife, the judgment must be reversed. Otherwise we are to consider, as conclusively establishing the marriage, the facts that plaintiff and defendant did sign the paper writing as set forth in finding 2, and mutually agreed to take each other as husband and wife; that in September, 1880, they commenced living and cohabiting together in the manner usual with married people, in an apartment furnished by him, and so continued to live and cohabit together down to November, 1881; that he wrote to her several letters, letters addressed "My dear wife," and that during all of said time they mutually assumed " toward each other" marital rights, duties, and obligations.

Section 55 of the Civil Code reads: "Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties, or obligations."

In the first sentence of the section of the code " marriage" is defined in terms which accord with the definition of the *status* or condition of marriage given by courts and learned law-writers. The civil contract of the parties is simply that they forthwith enter into a certain *status* or relation. The rights and obligations of that *status* are fixed by society in accordance with the principles of natural law, and are beyond and above the parties themselves. They cannot modify the terms on which they are to live together, nor superadd to the relation a single condition. (Schouler's Domestic Relations, 13.)

The code declares marriage to be a personal relation "arising out of contract." The personal relation created by the contract is not merely a contract. The contract is the portal through which the parties enter into the relation of marriage, and they can enter into that relation in no other way. Although all persons competent may marry at their own volition, the law fixes the rights and duties of those who are married. The section of the code defines " marriage," which, as distinguished from a present contract to marry, or the act of becoming married, is " the civil *status* of one man and one woman united in law for life, for the discharge to each other and to the community of the duties legally incumbent on those whose association is founded on the distinction of sex." (Bishop on Marriage and Divorce, 3.)

The contract out of which the marriage relation arises must be a contract then and there to become *husband and wife.* Hence, as appears from the cases cited by appellant, a contract between a man and woman to live and cohabit together, or even to assume the duties of husband and wife for a limited period, or so long as it may prove agreeable to both, or any other agreement which attempts to limit in extent or duration the rights and duties inseparably annexed to the *status* of matrimony, has sometimes been held not to be an agreement to become husband and wife, out of which arises the relation of marriage.

But to make the principle underlying such decisions applicable to the case at bar, it must be made to appear that, by the terms of our statute, the making public of the marriage relation is a duty or obligation annexed to the *status* of marriage, without which the *status* cannot exist. Such is the contention of appellant, based on the last sentence of section 55 of the Civil Code: " Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties, or obligations."

It is claimed, in the first place, that the promise to keep secret the contract of marriage for a period of two years, unless defendant should waive that stipulation, controlled and gave color to the other terms of the contract so that it became, not a contract of marriage, but a contract for illicit intercourse. In the second place, it is claimed that, independent of the stipulation as to secrecy, there was no marriage because of the fact of secrecy; since with secrecy there was and could be no "mutual assumption of marital rights, duties, or obligations," within the meaning of the code.

The words "duties" and "obligations" are evidently used in the same sense in the section of the code. The duties to be assumed are the obligations which flow from the relation of husband and wife. And the word "marital" must, to give any effect to the sentence in which it is found, be treated as the equivalent of "conjugal",—to include the rights and duties of the wife as well as those of the husband.

The validity of the alleged marriage we are considering must depend upon the fact that it was not made known by the parties. The promise of the plaintiff not to make it known for a period of two years, except with the consent of the defendant, was a collateral agreement, and not a condition to the marriage contract taking effect. The agreement to become husband and wife was complete. If she had published the writing called the declaration of marriage at any time, the publication would not have avoided the marriage contract, because the parties did not, if they could, agree, that the contract should become operative only in case the plaintiff should keep it secret for two years, unless in the mean time secrecy was waived by the defendant.

It is said by Mr. Bishop: "Not unfrequently the courts hold to be void some contract entered into at the time of the marriage, while the sufficiency of the marriage itself is not denied." (Marriage and Divorce, 266.) What-

ever may be the rule where some limitation is introduced into the contract of any of the obligations which accompany the state of wedlock, in such manner as to indicate that the contract would not have been entered into except upon the condition inserted, here, as we have seen, the promise not to make known the contract was an independent promise, and not a condition.

If the promise had been utterly disregarded, it could not be successfully contended that they were not married.

If the last sentence of section 55 means what appellant claims it means, there would have been no marriage in the absence of the promise on the part of plaintiff not to publish it. On the other hand, if there can be a marriage without publicity, the promise of the plaintiff that she would not make it known for a temporary period did not affect its validity, because not an illegal promise. At the common law, an agreement to keep the marriage secret does not invalidate it. (1 Bishop on Marriage and Divorce, sec. 252, and cases cited in note.)

In the judicial decisions which speak of an open recognition of the matrimonial union, the effect of such open recognition is considered as *evidence.* The fact of marriage is one thing; the evidence by which it may be established is another. The fact of the publication of their relation, by the conduct and declarations of the parties, may go far to corroborate testimony with respect to an actual contract to marry. And so, in cases where the contract has not been directly proved, evidence that the parties cohabitated together and were reputed to be husband and wife, or recognized or introduced each other as such, is admissible as tending to prove, and if sufficient proves, that they had previously entered into an agreement forthwith to become husband and wife. Yet evidence of cohabitation merely, without evidence of recognition of the relation, or repute of marriage, is not sufficient to establish an inference that there had been a mutual

consent to marry, in the absence of direct evidence of such consent. (*Estate of Briswalter,* 72 Cal. 107.)

Again, it has sometimes been said (and not incorrectly in view of the context) that at the common law marriage may be contracted *per verba de præsenti* merely, or *per verba de futuro cum copula.* But strictly speaking, there can be no contract *per verba de futuro* which imposes the *status* of marriage. When the parties have been shown to have agreed to a future marriage, evidence of the *copula* is admitted to prove that they changed their consent to a future marriage into a present consent. This by reason of a presumption in favor of morality. Thus evidence, whether direct or indirect, of a contract of marriage is always evidence of a consent *per verba de præsenti.*

But by our statute such present consent does *not* constitute marriage. (Civ. Code, sec. 55.) It must be followed by a solemnization, *or* by a mutual assumption of marital rights or duties. What does this mean?

It is urged that such mutual assumption is put as the alternative for "solemnization," and as solemnization implies and requires publicity, so it is intended that the assumption of rights and duties shall be public.

By section 78 of the Civil Code, the solemnization of a marriage is mentioned as a thing distinct from the license to marry, from the authentication of the marriage, and from the record of the marriage certificate. A marriage is solemnized when, in the presence of a judicial officer, priest, or minister, the parties declare that they take each other as husband and wife (Civ. Code, secs. 70, 71), and the officer or minister who witnesses this ceremony is said to "solemnize" the marriage. Every person authorized to solemnize marriage, who willfully solemnizes a marriage forbidden by law, or makes false return of a marriage, is guilty of a misdemeanor. (Pen. Code, secs. 359, 360.) But, if between competent persons, the solemnization makes the mar-

riage complete; although not preceded by license or succeeded by record. Such a marriage is valid, although retained within the knowledge of those present at its solemnization, without any communication of its existence to the community at large, which, in a certain sense, is said to have an interest in all marriages, or rather an interest that the institution of matrimony be maintained in its sacred purity. By the language of section 55 of the Civil Code, the solemnization *completes* the marriage, although not followed by a mutual assumption of marital rights and duties; since such assumption is required only where there is no solemnization.

It may be said, however, it is giving to the word "solemnization," in section 55, too narrow a meaning to confine it to the mere ceremony before the officer or minister; that it should be held to include the issuing of the license and the record of the certificate, with the publicity incidental to the license and record; that the purpose of the section must be to facilitate the proof of marriages by requiring their existence to be made public.

But the purpose of a statute can only be derived from its words, read in the light of the previous law. If it is so confused and uncertain that it can be given no intelligible meaning, we must consider the common law unchanged by it. The public policy of the state can only be ascertained by reference to the constitution and statutes. The courts cannot *create* a policy, and then declare, in support of the policy so created, that the legislature must have meant what it has not said. By the common law, private marriages, clearly proved, are valid; and it is a cardinal rule of interpretation that the common law continues except as altered by the statute.

It is certainly remarkable that if it was intended, consent must be followed by a "public" assumption of matrimonial rights and duties, the legislature did not say so in express terms, since, if so much was intended, the de-

parture from the common law would be radical.    It may
be claimed to be equally strange, if mere "consummation"
was meant, it was not so declared.    But giving force to
both of these suggestions, the utmost that could be argued
from them would be that the code-makers probably meant
neither of the two things,—a public assumption or mere
"consummation."

The commissioners who prepared the Civil Code of
California adopted as a foundation for their labors the
Civil Code prepared for submission to the legislature of
New York, departing in places only from the language
of the code proposed in the latter state.    It may throw
some light upon the question we are considering to com-
pare sections of the proposed New York code and sec-
tions of our code.

NEW YORK CODE.

Sec. 34.    Marriage is a personal relation, arising out of a civil contract, to which the consent of parties capable of making it is alone necessary.

Sec. 36.    Any unmarried male of the age of fourteen years or upward, and any unmarried female of the age of twelve years or upward, and not otherwise disqualified, is capable of *consenting* to marriage, etc.

CALIFORNIA CODE.

Sec. 55.    Marriage is a personal relation, arising out of a civil contract, to which the consent of parties capable of making it is necessary.    Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties, or obligations.

Sec. 56.    Any unmarried male of the age of eighteen years or upwards, and any unmarried female of the age of fourteen years or upwards, and not otherwise disqualified, are capable of *consenting to and consummating* marriage.

Sec. 35. *Consent* to a marriage may be manifested in any form, and may be proved like any other fact.

Sec. 57. *Consent* to and subsequent *consummation* of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases.

The distribution of a statute into sections is arbitrary, and merely for convenience of reference. The New York and California codes may be read respectively: "The consent of capable parties is alone necessary to constitute marriage; the consent may be manifested in any form, and may be proved like any other fact." (N. Y. Code.) "Consent alone will not constitute marriage; it must be followed by a mutual assumption of marital rights and duties; the consent and consummation may be manifested in any form, and proved under the same general rules of evidence as other facts." (Cal. Code.)

The word "consummation," whenever used as something different from the mere consent or formal solemnization of marriage, had always been held to mean "simply sexual intercourse, copulation, nothing more nor less." Section 57 of our Civil Code provides how this consummation may be proved. As consummation, if it does not constitute is at least included in an assumption of marital rights and duties, it is a circumstance of some significance that, when providing for the mode of proving "consent and subsequent consummation," nothing is said with respect to the manner of proving other rights and duties to be mutually assumed, if the proof of others is contemplated by section 55. It is a circumstance tending to show that it was the intention to change the New York code only by requiring consummation to follow mutual present consent. If more was intended, it would have been easy to say: "The mutual

assumption of marital rights, duties, or obligations may be proved under the same general rules of evidence as facts in other cases."

It has been suggested that "consummation," in sections 56 and 57, is to be interpreted in the broader sense of "completion"; and as, by section 55, a marriage is not complete until *after* a public recognition of it by the parties, the consummation of sections 56 and 57 means the completion of the marriage as provided in section 55. This is only saying that, in the absence of solemnization, there is no marriage until after cohabitation known to others, or public recognition of the marriage *and* copulation.

This, as we shall see, the sections cannot mean; the legislature could not have intended that (after a present consent to marry) a period of cohabitation, known to others, should be necessary to the constitution of marriage, or precede its "completion"; for if so, the woman would be compelled to live with the man in such manner as that their coition would be inferred before their coition would be lawful.

Each article of the code is preceded by head-notes, numbered to correspond with the sections following, and purporting to give in brief the subject of each of such sections. These head-notes are entitled to more consideration than the "title" to an entire act. They are parts of the statute limiting and defining the sections to which they refer. To refuse to give effect to them according to their import would be to make the law, not to administer it. (*Barnes* v. *Jones*, 51 Cal. 303; McKinstry, J., in *Ex parte Koser*, 60 Cal. 206; *Williams* v. *People*, 45 Barb. 201; *People* v. *Molineux*, 53 Barb. 15; 40 N. Y. 119.)

As we have seen, section 57 of the Civil Code relates to the proof of "consent and subsequent consummation." Additional force is given to the suggestion that it was intended that consent and consummation should con-

stitute marriage by the fact that the head-note to that section is: " Marriage, how manifested and proved."

It may be added, that when the propriety of requiring a public declaration to accompany unsolemnized marriages was directly called to the attention of the legislature of California, the legislature refused to act upon the suggestion, but permitted section 55 to remain as it now is. Among the amendments reported by the revisory commissioners, appointed in 1873, was one to make section 55 of the Civil Code read: "Marriage is a personal relation arising out of a civil contract, to which the consent of the parties is necessary. To render marriage hereafter contracted in this state valid, the contract must be accompanied by a solemnization, *or by a public declaration*, as provided in this chapter." While adopting many of the amendments proposed by the commissioners, the legislature rejected this one.

We do not propose to decide the question whether at the common law consummation as well as consent was necessary to constitute marriage.

Mr. Bishop says: "Consummation—the *copula*—is no part of the marriage; it only serves, to some extent, as evidence thereof. A maxim of the civil law, equally also of the ecclesiastical, of the common,—indeed, of all law governing the subject is, *Consensus, non concubitus, facit matrimonium.* Hence, when parties capable of intermarrying agree to a present marriage, the relation is made thereby complete. This is true everywhere, subject to the qualification that in some countries there are laws requiring the addition of specified ceremonies and forms, but the *copula* gives the marriage nowhere any additional strength." (Bishop on Marriage and Divorce, 228; and see cases cited in the note.)

And Chancellor Kent says: " If the contract be made *per verba de præsenti* without cohabitation, . . . . it amounts to valid marriage in the absence of all civil regulations to the contrary." (2 Kent's Com. 87.)

In this country, in those states where there is no statute prohibiting common-law marriages, and declaring all invalid except those solemnized in some particular form, the decided weight of authority is, that to constitute marriage, the contract *per verba de præsenti* need not be succeeded by a consummation.

Nor is it necessary here to decide whether, at the common law of England, a present consent, with or without subsequent cohabitation, constituted marriage, in the absence of religious sanction, evidenced by the presence and approval of a clergyman of the established church.

In a note to section 55 of our Civil Code, the California commissioners say: "*As to whether consent alone constitutes marriage:* In *Jewell's Heirs* v. *Jewell,* 1 How. 219, the court was equally divided. In *Regina* v. *Millis,* 10 Clark & F. 534, the House of Lords, on appeal from Ireland, were also equally divided on the same question. On reference of the question to the court, Tindal, C. J., gave the unanimous opinion of the court that it was not a valid marriage, and held 'that by the law of England, as it existed at the time of the marriage act, a contract of marriage *per verba de præsenti* was indissoluble between the parties themselves, and afforded to either of them, by application to the spiritual court, the power of compelling the solemnization of an actual marriage; but such contract never constituted a full and complete marriage in itself, unless made in the presence and with the intervention of a minister in holy orders. The civil contract and the religious ceremony were both necessary to a perfect marriage by the common law.'" (Civ. Code, annotated, sec. 55.)

The opinion referred to in the note as the opinion of the court was, in the opinion of the judges, in response to questions put to them by the lords, and did not decide the case. The judgment of the Queen's Bench was affirmed because the votes in the House of Lords for reversing or affirming it were equal. The views of the judges

in their answers to the questions submitted to them in *Regina* v. *Millis* have since been doubted, perhaps over-ruled, in England. But the question discussed in that case was, whether by the law of England, prior to the marriage act, 26 George II., a contract *per verba de præsenti*, without the intervention of a minister in orders, was sufficient to make a complete marriage, so that, by marrying a second time, the defendant made himself liable to the pains and penalties of bigamy.

In *Jewell* v. *Jewell*, 1 How. 219 b, also referred to in the note, the circuit court directed the jury that, in the absence of solemnization, "if the contract be made *per verba de præsenti*, and remains *without* cohabitation, or if made *per verba de futuro*, and be followed by consummation, it amounts to a valid marriage, and which the parties (being competent as to age and consent) cannot dissolve." Upon this question the supreme court of the United States was equally divided.

The reference to the two cases in the commissioners' note was evidently to indicate that the object of the last clause of section 55 was to declare " a solemnization " not necessary, provided the mutual consent be followed by something else. The cases referred to leave unsettled the questions whether in England a religious ceremony was necessary prior to the marriage act, and whether, in some of the American states, where peculiar laws requiring certain ceremonies obtain, a solemnization in accordance with the forms required by such laws is necessary, in *addition* to the consent of the parties.

They are of no assistance in the present inquiry, except so far as they tend to show the purpose of the code, — already sufficiently clear from its language, — that, in the absence of solemnization, more than mere consent should be requisite to constitute marriage.

As we have said, the Civil Code of California is based upon and in the main follows the Civil Code as reported to the legislature of New York. The California com-

missioners changed section 34 of the New York code.
That section provided that consent alone is necessary to
constitute marriage.   Our commissioners altered this by
declaring, "Consent alone will not constitute marriage,"
and then added the clause so often quoted.   This was
done with the note of the New York commissioners (to
section 34) before them.   That note clearly shows the
object of section 34.   There had been two opinions
among jurists, many holding that present consent makes
marriage; some that, to make a marriage, either *con-
summation* or solemnization was also requisite.   The
New York commissioners determined to provide that
present consent, *without* consummation or solemnization,
should be sufficient.   The note of the New York com-
missioners reads: "By 2 Rev. Stats. 138, sec. 1, mar-
riage is declared to be a civil contract to which consent
is necessary; but whether anything more than consent
is necessary has been mooted, some authorities deeming
that either consummation or solemnization is also requi-
site.   (*Jaques* v. *Public Administrator,* 1 Bradf. 499; and
see 2 Parsons on Contracts, 5th ed., 74.)   This provision
makes consent alone sufficient, and is in accordance with
the views declared in *Starr* v. *Peck,* 1 Hill, 270; *Jackson*
v. *Winne,* 7 Wend. 47; *Caujolle* v. *Ferrie,* 23 N. Y. 106;
*Hayes* v. *People,* 25 N. Y. 390; 82 Am. Dec. 364."

It is difficult to avoid the conclusion that the Califor-
nia commissioners, with the foregoing note before them,
decided to adopt the position rejected by the New York
commissioners, and to provide that in the absence of
solemnization consent alone should not constitute mar-
riage, but that it must be followed by "consummation."

And yet it may be said, the phraseology does excite a
suspicion that something more or different was intended,
since it is hard to believe that the commissioners were
actuated by a hyperdelicacy in rejecting a term in that
particular sentence which they subsequently did not
hesitate to employ.

The difficulty of arriving at the meaning of the last clause of section 55 of our Civil Code was very fully set forth and illustrated by John Norton Pomeroy, late professor in the college of law of the University of California, in two articles published by him. (4 West Coast Rep. 50, 152.) These articles were referred to by counsel at the argument. The theme of the series of articles in which the two above cited are included is the necessity of applying well-known, uniform, and consistent principles of interpretation in adjudicating upon, applying, and enforcing all the various sections of the Civil Code. (3 West Coast Rep. 585.) His conclusion is, that the only method by which any certain, consistent, and just results can be attained through an interpretation of the provisions of the code is by adopting and following the principle that they are, "in general," declaratory of common-law and equity rules. (4 West Coast Rep. 150.)

And he points out, that where the provisions of the code are clearly not merely declaratory of the common law, the great, and in some instances apparently insurmountable, difficulty is to ascertain how far the particular provision departs from or changes the pre-existing law. This arises from a defect "which may be said to characterize the entire code as a work of legislation." "From their constant but wholly unnecessary practice of abandoning well-known legal terms and phrases, the signification, force, and effect of which had long been settled and certain, and of adopting instead thereof an unknown and hitherto unused language and terminology, as well in their ordinary definitions as in the statement of general doctrines and single rules, they constantly create an uncertainty whether they intend merely to declare and re-state, without change, a known common-law definition, doctrine, or rule, or whether, on the other hand, they intend to alter or modify such definition, doctrine, or rule; and if the latter be their general intent, they make it uncertain how far the alteration extends."

(3 West Coast Rep. 586.)   Among other illustrations of
the employment of language which renders the meaning,
intent, and consequent effect of a particular section
" obscure and uncertain," he cites section 55 of the Civil
Code.

With reference to that. section he says: "'Consent
alone will not constitute a marriage; it must be followed
by a solemnization, *or by a mutual assumption of marital
rights, duties, or obligations.'*   What is the meaning of
this strange phrase?   The phrase is absolutely unknown
to the law.   Does it mean that the two spouses must live
openly as husband and wife,—must hold each other out
to the world as husband and wife, etc.?   There are
strong arguments against that meaning.   In the first
place, the phraseology to describe exactly that condition
has long been settled, and is very familiar; and if the
authors of the code had such a meaning, it seems hardly
possible that they should reject this familiar and express-
ive phraseology.   Instead of saying that consent must
be followed by 'habit and repute,' or 'by the parties
holding themselves out to the world as husband and
wife,' which would have left no doubt as to their mean-
ing, they adopt this uncouth phrase, which does not
necessarily have such a meaning.   But, in the second
place, such an alteration of the common-law rule seems
to be entirely without any reason, and opposed to com-
mon sense.   Under the law previous to the code, proof
that two parties had treated each other as husband and
wife, had lived together as such, and had held each other
out to the world as such, was sufficient to enable a jury
or court to infer and find the fact of marriage.   Why?
Not at all because such living and holding out of itself
constitutes a marriage; but solely because from such
living and holding out the court or jury may find that
at some previous time the two parties did, as a fact, con-
sent to be married,—did, as a fact, agree to be husband
and wife.   This conclusion is sustained by all the de-

cisions of authority. The previous actual consent or
agreement to be husband and wife is the ultimate and
essential fact which the jury must find; the mode of life,
the holding out, and the like, are nothing but circum-
stantial evidence from which that fact may be inferred.
Now, when living as husband and wife, and holding out
as such, were only necessary as evidence for the pur-
pose of *inferring* the fact of a previous consent, it seems
strange and useless to require evidence of the same kind,
of holding out and living as husband and wife, and the
like, when the fact of a prior consent has already been
clearly established by other and independent evidence."
(4 West Coast Rep. 51.)

In a subsequent article (4 West Coast Rep. 152) the
same learned writer said: "Whatever weight may be due
the considerations before suggested in a former article,
there are, in my opinion, equal if not greater obstacles
to an interpretation which treats the section [55] as
having made no material alteration in the rule as
previously settled,—the common-law rule. *If, by the
previous rule,* after *verba de præsenti,* the *copula* was
sufficient to constitute a marriage, it seems almost im-
possible to suppose that in the phrase, "by a mutual
assumption of marital rights, duties, or obligations,' the
authors of the code and the legislature did not mean
something more and different,—something additional.
We may wonder at the employment of terms so unlike
the usual phraseology of statutes, and may regret that
words more certain and definite in their meaning were
not selected; and still, if we give any fair and reasonable
construction to all the language, we can hardly escape
the conclusion that 'a mutual assumption of marital
rights, duties, or obligations' imports acts and conduct
of the two parties *toward each other,* and rights and duties
belonging to the marriage relation, which cannot pos-
sibly be embraced in the word '*copula,*' or the word
'consummation,' or even, *perhaps,* the word 'cohabita-
tion.'"

There is no statement in either article that, in the opinion of the writer, a public recognition of the marriage relation is required by the code. The writer does not pretend to interpret the provision of the code, and his interpretation would not have been authoritative. His very purpose is to show the uncertainty of its language, by pointing out the objections to holding it to mean either consummation alone, or more than consummation.

Much of the force of the argument of the second article is taken away when the uncertainty of the premise on which it is based is considered. "If, by the previous rule, after *verba de præsenti,* the *copula* was sufficient," would seem to imply that, at the common law, the *copula* was necessary to constitute marriage. But, as we have seen, Mr. Bishop, in his work on marriage and divorce, —referring to authorities in support of his position,— lays down the rule that the *copula* adds no force to the present consent, but the latter makes a complete marriage without the *copula.* Kent holds to the same view; and such is the effect of the decided weight of authority in this country. The New York cases cited in the note of the commissioners in that state are to the effect that, where the contract is *per verba de præsenti,* neither consummation nor solemnization is requisite to make a complete marriage. Yet the case in Bradford, and what is said in Parsons on Contracts, induced the New York commissioners to declare in express words that neither should be necessary. The California commissioners deemed it wiser to declare that consent alone should not constitute matrimony, but it cannot be assumed that the provision of our code was based upon the hypothesis that by the previous law there was no marriage unless consent was followed by consummation.

At the most, the result of the statements of Professor Pomeroy is, that it is doubtful whether the language of section 55 of the Civil Code means that the consent

must be followed by consummation, or by consummation and something more.

It is claimed that in *Graham* v. *Bennett*, 2 Cal. 503, the supreme court (by Heydenfeldt, J.), speaking of an unsolemnized marriage,—entered into in 1845,—decided that to constitute such a marriage there must be an open assumption of the relative duties of husband and wife; and that the code commissioners clearly showed their intention to adopt the rule laid down in that case. In *Graham* v. *Bennett, supra,* the facts showed that the consent was in the presence of witnesses, and was followed by open and acknowledged cohabitation as man and wife. The learned judge delivering the opinion there said: " Marriage is regarded as a civil contract, and no form is necessary for its solemnization. If it take place between parties able to contract, an open avowal of the intention, and an assumption of the relative duties which it imposes on each other, is sufficient to render it valid and binding. The *ceremony,* therefore, which took place between the plaintiff and defendant, as shown by the complaint was sufficient to constitute them man and wife," etc. The ceremony set forth in the complaint was the signing by the parties of the writing, witnessed by persons therein named, which reads: " Marriage in the year 1845. Isaac Graham of Santa Cruz, and Catherine Bennett of San Francisco, were married at Lyant, by banns, this twenty-sixth day of September, 1845, by one who was requested to read the ceremony, Henry Ford. This marriage was solemnized between us, Isaac Graham, Catherine Bennett. In presence of William Werm, Henry Ford." The "ceremony" held to be sufficient to constitute the parties man and wife was the execution of the foregoing writing. By it, in the presence of the witnesses, they made open avowal of their intention, and agreed to take upon themselves the relative duties imposed by marriage. Even if the language of the court should be construed to mean more than

an assumption, as proved by the ceremony or consent, it was at most but a decision that upon the facts of that case—the consent and subsequent open assumption of marital duties—the parties were married. The language of a court must always be read in view of the facts before it. This is an established canon of legal criticism. The court did not decide that all the facts appearing in that case must exist to constitute marriage, but that the facts there appearing proved a marriage. The former could not have been intended, because it would be in violation of every precedent. The marriage involved in *Graham* v. *Bennett* took place prior to the acquisition of California by the United States, but the court assumed that the law of Mexico was the same as the common law. It had never been held in this country that, at common law, a contract *per verba de præsenti* — followed or not followed by the *copula*—must be succeeded by a public assumption of the relative duties arising out of the *status* of marriage. Nor was such an interpretation placed upon the decision of *Graham* v. *Bennett* during the twenty odd years intervening between that decision and the adoption of the codes.

While this action was pending in the court below, a judgment of the circuit court of the United States for Maryland was reversed by the supreme court of the United States. (*State of Maryland for the Use of Markley* v. *Baldwin*, 112 U. S. 490.) One of the issues there was, Was Markley, the real plaintiff, a son and heir of Daniel Lord, deceased? And it involved the validity of an alleged marriage between the deceased and the mother of the plaintiff. In the circuit court there was a general verdict for the defendants.

A witness, one Cross, testified at the trial that the deceased had admitted to him his marriage with plaintiff's mother, and had given a certain reason for concealing his own name and taking hers; also, that after her death deceased had spoken of his marriage, and attributed all

his early success to her.   One of the defendants was permitted, against the objection of the plaintiff, to testify to conversations with the deceased about Cross, and that the deceased had expressed great distrust of him, calling him anything but an honest man, etc.

The supreme court held this last testimony clearly inadmissible, it being mere hearsay.   For the error in admitting it, against the objection of the plaintiff, the judgment of the circuit court was reversed, and the cause remanded for a new trial.   No exception seems to have been taken to the charge of the circuit judge.

Mr. Justice Field said that, as for the error mentioned the cause must go back for a new trial, it was proper to say that by the law of Pennsylvania, where, if at all, the parties were married, a. marriage could be made *per verba de præsenti*, without attending ceremonies, religious or civil; that such is the doctrine of the common law. " But where no such ceremonies are required, and no record is made to attest the marriage, some public recognition of it is necessary as evidence of its existence."   He adds, the charge of the court should direct the jury as to the necessity of such recognition in the absence of statutory regulations on the subject.   And the learned judge said: " The law of Pennsylvania, as we are advised, requires in some form such recognition.   See *Nathan's Case*, 2 Brewst. 149, 153; *Commonwealth* v. *Stump*, 53 Pa. St. 132."

In *Maryland* v. *Baldwin* no witness was present at any marriage ceremony, or at any contract of marriage; a marriage, if it existed, was to be inferred from their declarations and living together (p. 493, 494).   The language of the court is to be interpreted in view of the facts.   If, however, as claimed by appellant, it was intended to be said that, when there is direct evidence of a contract of marriage, by words in the present tense, there must also, by the law of Pennsylvania, be evidence of a public recognition of the marriage, a reference to

the two cases cited shows that the learned judge was wrongly advised as to the law of that state.

In *Commonwealth* v. *Stump* the supreme court of Pennsylvania decided: "*Where there is no proof of actual marriage*, cohabitation and reputation are necessary to ground a presumption of marriage; proof of cohabitation alone is insufficient." (*Commonwealth* v. *Stump*, 53 Pa. St. 132, 135; 91 Am. Dec. 198.)

In *Nathan's Case* the court of quarter sessions held that the wife was a competent witness to prove a present contract to marry; and independent of her testimony (p. 168), the marriage was sufficiently proved by the acts and declarations of the parties; that reputation and cohabitation are sufficient evidence of marriage, and may be conclusive where the rights of third persons are affected, and the legitimacy of children called in question.

Even if the "mutual assumption," etc., be a broader *expression* than "consummation," it may be given full effect by holding it to include, not only consummation directly proved, as it rarely is or can be, but also the mutual taking on, by a man and woman, of marital rights and duties from which consummation may be inferred. The phrase called by Professor Pomeroy "uncouth" does not, as said by him, require that they shall "hold themselves out to the world as husband and wife."

The common law underlies all our legislation, and furnishes the rule of decision except in so far as the statutes have changed the common law. When the common law is departed from by a provision of the code, effect is to be given to the provision to the extent—and only to the extent—of the departure. This is not saying that the code must be strictly construed, as those terms were sometimes applied to classes of statutes prior to the codes. Every provision of the code expressed in intelligible language must be given full force and effect. But, under pretense of an interpretation,—or explanation in different language,—the courts cannot add to the signifi-

cant terms of a statute; nor, by resorting to conjecture, can they go beyond the intent derivable from the terms actually employed, considered with the pre-existing law. Certainly the courts are not authorized to declare something more must have been intended, because, in the opinion of individual judges, a greater departure from the common law would be wise or expedient. As said by Lord Stowell, secrecy sometimes attends the most regular marriages, "from prudential reasons" (*Dalrymple* v. *Dalrymple*, 2 Hagg. Const. 54), although when prudential reasons do not appear, that may cast doubt upon the fact of marriage. As valid marriages might be secret at the common law, we cannot say that the departure in the code from the common law requires that in every case they must be public unless the *words* employed demand such interpretation.

The question presented by these findings (and we can know nothing of the case except from the findings) is this: Shall a man be permitted to say: "True, this woman and I agreed to enter into the marriage state, by words in the present tense. That agreement was followed by cohabitation, and by our mutually taking upon ourselves 'toward each other' marital rights, duties, and obligations. But we are not married, because we did not discharge a marital duty, to wit, make public the relation between us; but, on the contrary, by mutual consent, kept it secret for a period; and I never acknowledged it. The community had a right to know that we were married, or pretended to be married, and I appeal to public policy,—as declared by section 55 of the Civil Code,—and to great principles of *morality*, which demand that such a union as ours shall be declared to be illicit." Surely, if the legislators had intended consequences such as would flow from upholding a party in a position like that, they would have expressed their purpose in unmistakable terms.

If the position of appellant be correct, there is no

marriage, notwithstanding previous consent, until after a public recognition of the marriage relation. But from cohabitation and such recognition, sexual intercourse may properly be inferred, and there can be no lawful intercourse of that character before marriage. It would follow, therefore, that in the absence of solemnization, a marriage could only be proved by establishing a fact from which unlawful intercourse could be inferred. On the other hand, if consummation, "the most intimate union of the sexes," completes the marriage, and is an assumption of marital rights and duties, and the consummation may be proved directly, or as an inference from another fact from which it may be inferred, no such anomaly is presented.

The statute either means that, after present consent to marriage, the consummation (however proved) is sufficient evidence of an assumption of marital rights and duties; or the acts, other than consummation, must precede consummation; the consummation must be the last of the series of acts. If cohabitation as man and wife, to the knowledge of the acquaintances of the parties, must precede the consummation, how long must it be continued, and to what extent must it be made public, to authorize sexual intercourse? It is incredible the legislature intended that copulation may take place before the marriage is complete; or to put it in the power of the man, after he has enjoyed the person of the woman, to say, "I will proceed no further." Yet it is the duty of the woman, after the mutual consent to present marriage, to live with the man; and their cohabitation must, from the nature of things, create the presumption of copulation; which reduces the statute to an absurdity.

It does not require a public assumption of the marriage relation to create a presumption of consummation. The cohabitation of persons of opposite sexes, whether legal or illicit, suggests sexual intercourse (Imperial Dict.), and is evidence of it. When previous consent is

proved, cohabitation is itself evidence of an assumption of marital rights and duties, and is evidence of such assumption by means of the consummation which has completed the marriage.

It is urged there can be no "mutual assumption" of marital rights and duties which is unknown to the community at large, or to the acquaintances of the parties; that the word "mutual" requires an "open and respectful" recognition before the community "in all their social intercourse"; that they stand to each other in the relation of husband and wife. But where the holding out to the world of the relation is evidence of a prior contract, such evidence does not necessarily depend for its effect upon amenity of manners, or upon the degree to which the parties extend to each other the affectionate respect which should attend the intercourse of husband and wife in well-ordered households. The statute does not make the validity of a marriage by consent depend upon the full performance of their mutual duties; the failure to perform certain important obligations is made ground for divorce; it may be conceded the code requires the mutual assumption of such duties.

The assumption of rights and duties by the parties must be *mutual*, and the code is given effect if they are assumed between and toward each other. The title of a tale by a great novelist—"Our Mutual Friend"—has been much criticised as a misapplication of terms, and it presents, perhaps, the only instance in standard literature of the application of the word "mutual" to that which cannot be interchanged. The adjective "mutual" is defined: "Reciprocally acting or related; reciprocally receiving; reciprocally given and received; reciprocal; interchanged; as mutual love, assistance, advantage, aversion." (Webster.) If the words had been "mutual performance" of the duties common to both, they would have demanded simply the performance of such duties to each other, and would not have required that the rela-

tion should be made public, unless the making it public is a duty inherent in the relation, such as cannot be waived; which it is not.

It is said, however, the "assumption" of the code implies publicity; that the word is ordinarily used as appearing to others in a given character, station, or relation, and necessarily conveys the idea of a public appearance. But the first definition of the lexicographer referred to in the briefs is, "the act of assuming or taking to or upon one's self." (*Ad* and *sumere.*) It is sometimes used to express the pretension of having or possessing; the taking on in appearance, and not in reality. But when used in the last sense, it does not necessarily mean a pretense presented to the eyes of the community, although it may include such general pretense. To adopt the illustrations of counsel, one may assume to an individual,—take upon himself by words, manner, or bearing,—in the presence of one person alone, a virtue, though he "have it not." To deceive a single soul, the Devil hath power to assume a "pleasing shape."

The section of the code requires that the parties shall mutually take on themselves marital rights and duties. This they agree to do when they agree to become husband and wife, but inasmuch as the section provides that the mutual assumption shall "follow" consent, it may be conceded there must be evidence of other facts, showing the assumption, in addition to direct evidence of consent; that the code does away with the presumption of consummation, which has sometimes been said to arise out of a contract *per verba de præsenti.*

But the code does not declare that the fact of marriage must be proved independently of, and without regard to, direct evidence of an actual present consent. Since, as before the code, evidence of cohabitation, and that the parties, in the presence and hearing of their acquaintances,— openly, "in their social intercourse,"—

have recognized each other as husband and wife, is suffi-
cient to prove previous consent, and therefore marriage.
In effect, the contention of appellant is, that direct evi-
dence of a consent to marry *per verba de præsenti*, how-
ever full and satisfactory, shall count for nothing; but
that in every case, in the absence of solemnization, there
must be evidence sufficient, in and of itself, to prove the
marriage, independent of direct evidence of an actual
contract.  But such independent and complete proof of
the marriage is not made necessary by the words "con-
sent *alone* will not constitute marriage; it [the consent]
must be followed by the mutual assumption," etc.  The
language clearly implies that the "mutual assumption"
is to be shown, not by evidence sufficient of itself to
prove consent, but as something in addition to consent
already proved.

Under the code, the fact to be proved is the existence
of the relation which "arises out of a civil contract."
Beside evidence of the mutual consent of the parties,
which makes the contract, there must be other evidence
that they have assumed toward each other marital rights
and duties.

"There are two principal ends of marriage,—a lawful
indulgence of the passions to prevent licentiousness, and
the procreation of children under the shield and sanction
of the law." (Stewart on Marriage and Divorce, sec. 103.)
The intercourse, which is the means by which these ends
are attained, is both a right and duty.  Evidence that the
man and woman have enjoyed the right and discharged
the duty, whether direct, or consisting of proof of another
fact from which the intercourse may be inferred,—as
cohabitation,—is, when preceded by present consent to
marry, evidence that the parties to the contract have
actually assumed all the duties incident to marriage.
Whether, in addition to and in the light of the consent,
there is sufficient evidence that they have taken on them-

selves marital rights and duties, must depend upon the circumstances proved in each case.

When parties agree to a present marriage, they mutually agree to take on themselves the obligations appertaining to the marriage state; but the code requires that to justify a finding of marriage, there shall be additional evidence that they have assumed marital rights or obligations. If a case be supposed, where, immediately after consent to present marriage, the parties have permanently separated, there would, perhaps, be no marriage; not because they would not have mutually agreed to assume marital obligations, but because the section of the code requires evidence of other and subsequent facts showing the actual assumption of marital obligations. In considering the evidence of such facts subsequently occurring, however, the direct evidence of previous consent is not to be rejected. All the evidence is to be taken together.

As we have seen, cohabitation alone does not prove marriage, because the relation between a man and woman cohabitating may not be that of husband and wife. But cohabitation, with evidence of a reputation that they were married, created by the conduct of the parties, proves a previous consent, and marriage. So, under the code, cohabitation with direct evidence of previous consent proves a marriage, because, when viewed with the previous consent, cohabitation is evidence of a mutual assumption, etc. Cohabitation being proved, *direct proof* of previous consent is at least as effective as is evidence of reputation from which the previous consent may be inferred.

So far as we are informed, the only law-writer, other than Professor Pomeroy, who has employed language similar to that of our Civil Code is Mr. Stewart, in his work on marriage and divorce, published in 1884. At section 103, speaking of "the consummation," he defines consummation as "subsequent sexual intercourse between the parties, or the assumption of the rights, duties,

and obligations of husband and wife, from which such intercourse may be *implied.*"

In a note he refers to section 55 of the California code, and to the dissenting opinion of Judge Mills of the Kentucky court of appeals, in *Dumaresly* v. *Fishly,* 3 A. K. Marsh. 377.    That was an action of slander, in which the defendant pleaded that the plaintiff was his wife. The court held that the position that consummation, in addition to present consent, was necessary to constitute a valid marriage in fact, was "neither founded on reason nor supported by authority"; citing 1 Ruth. Inst. 345; Co. Lit. 35; 1 Bla. Com. 433.    The dissenting judge thought that a marriage not solemnized according to statutory formalities "should require consummation evidenced by cohabitation."    If the learned author intended to say that the California code had adopted the rule thought by Judge Mills to be the proper one, then the code simply requires that the consent shall be followed by cohabitation from which sexual intercourse may be inferred.    It is only by the inference to be drawn from cohabitation as husband and wife cohabit that such intercourse is ordinarily proved.    In his dissenting opinion, Judge Mills nowhere suggests that a public recognition of the marriage relation is necessary; and the language of Mr. Stewart, read in the light of his note, intimates that the consummation is the important matter; that the consummation may be inferred from the mutual assumption of marital rights and duties, and that such assumption may be proved under our code by evidence of *cohabitation.*

Cohabitation may be lawful or illicit.    It is lawful if preceded by consent, by words in the present, however such consent may be proved.    When cohabitation follows consent, it is evidence that the parties have mutually assumed marital rights and duties, as it is evidence that the marriage has been completed by consummation.

The rights and duties of married persons are manifold.

Except as to property rights, the code does not pretend to enumerate them, except by saying that the parties contract "toward each other obligations of mutual respect, fidelity, and support." (Civ. Code, sec. 155.) The common-law decisions do not define them save in general terms. Nor does the code provide that consent shall not constitute marriage unless followed by a full enjoyment and complete performance of all the rights and duties appertaining to marriage. Whatever else the section may mean, it does not mean that present consent followed by consummation and cohabitation, and by other acts tending and sufficient to show that the parties have mutually assumed conjugal rights and duties, shall be held no marriage, at the instance of one who may have become dissatisfied with the relation, in case it is shown that either party has not actually discharged all the duties which an exalted view of the subject may induce one to believe to be incidents of marriage.

The court below found *as facts* that, during a certain period after the consent to marry, "the plaintiff and defendant lived and cohabited in the way usual with married people, . . . . and mutually assumed toward each other marital rights, duties, and obligations." If, as we have said, they might mutually assume marital rights and duties, although their relation was kept secret, the insertion of the words "toward each other" does not vitiate the finding, and the finding of facts is conclusive on this appeal.

Moreover, marital rights and duties are correlative; there can be no rights without corresponding duties. The rights of the wife are to those things which she may claim of the husband, and *vice versa*. The claim to some of her rights may be waived temporarily, and when waived, there is no corresponding duty to be done while the claim is in abeyance. To make public the marriage relation, notwithstanding a mutual assent to privacy, may be conceded to be a duty, when the claim to pub-

licity is asserted; but it is not an absolute duty to be performed while the mutual consent to privacy continues. Our conclusion is, that the provision of the code requiring a mutual assumption of marital rights and duties to follow consent does not make it indispensable to the validity of the marriage that the relation between the parties shall be made public. The section of the code does not purport to require it. The policy of the common law does not demand it, and the policy of the common law has not been changed by statutory enactment.

It would be giving the words of the statute a meaning which does not accord with just and established rules of interpretation to hold that these parties, who, as found by the superior court, mutually consented to become husband and wife, thereafter cohabited in the manner usual with married people, and mutually assumed toward each other marital rights and duties, were not married. We cannot so construe the code to meet the supposed exigencies of the particular case.

On the 16th of February, 1885, the following order was entered in the cause:—

"It is hereby ordered that the defendant pay to the plaintiff, or her order, on or before the ninth day of March, 1885, the sum of seven thousand five hundred dollars as alimony herein, and the further sum of twenty-five hundred dollars on or before the eighth day of April, 1885, and the same amount on or before the eighth day of each and every month thereafter, as alimony, until the further order of this court.

"It is further ordered that the defendant pay as counsel fees herein, on or before the ninth day of March, 1885, the sum of fifty-five thousand dollars, that is to say, twenty thousand dollars to Messrs. Tyler and Tyler, or order; ten thousand dollars to George Flournoy, or order; ten thousand dollars to Walter Levy, or order; ten thousand dollars to David S. Terry, or order; and

five thousand dollars to R. P. Clement, or order; and in case any of such payments are not made on or before the time herein fixed, then the party or the parties entitled thereto shall have execution therefor, pursuant to section 1007 of the Code of Civil Procedure of the state of California."

The court has held the foregoing order to be appealable.

The order, so far as it relates to counsel fees, is, in effect, a judgment that the defendant in this action pay to Messrs. Tyler and Tyler, and to the other counsel named, respectively, the several sums mentioned,—aggregating fifty-five thousand dollars,—and that Messrs. Tyler and Tyler and each of the others shall have execution for the sum directed to be paid to them or him.

Section 137 of the Civil Code provides while " an action for divorce is pending the court may, in its discretion, require the husband to pay as alimony any money necessary to enable the wife to support herself or her children, or to prosecute or defend the action." There can be no doubt the order must require the alimony to be paid to *the wife,* and it seems equally plain it was intended that the money ordered to be paid, as necessary to prosecute or defend the action, should be ordered paid to her.

Section 137 regulates the matter in this state, and that section contemplates an order to pay to the wife. It would seem that where the statutes are silent on the subject, temporary alimony and suit money can be awarded to the wife. (2 Bishop on Marriage and Divorce, sec. 396.) But when awarded, either by statute or upon general principles, "suit money" is awarded to her; and by section 137 counsel fees, if ordered to be paid, are ordered as part of her necessary expenses for prosecuting or defending the action for divorce. There is a great deal of American authority that the wife's legal agent cannot recover compensation of the husband, in a distinct action, for his services rendered her in a suit for

divorce. (Cases cited to section 391, 2 Bishop on Marriage and Divorce.) He certainly cannot recover a judgment for such services, past and contemplated, upon a motion in the suit for divorce. The order here was a direct judgment for money in favor of persons not parties to the suit, and to that extent was irregular and void.

Moreover, it would seem to be an undeserved reflection upon the administration of justice in the superior courts to hold that at least six lawyers were "necessary" to present the merits of plaintiff's cause. The wife cannot, as of course, employ as many attorneys as she chooses, and compel the husband to furnish funds for whatever she is to pay them. The rule was laid down in Massachusetts to be, that the sum required to be paid by him is not to exceed what, under all the circumstances, may be reasonable for the compensation of counsel and the payment of other charges, without regard to what might properly be demanded, as between counsel and client, by the counsel actually employed. (*Baldwin* v. *Baldwin,* 6 Gray, 341.)

In *Williams* v. *Williams,* where it would seem several members of the bar were employed, the supreme court of Wisconsin said: "There can be no doubt whatever that any one of the attorneys for plaintiff, without any severe strain upon his professional ability, would have prosecuted this action to the same result." (29 Wis. 528.)

Making every allowance for the suggested difficulties in the prosecution of the case at bar and the labors of counsel,—the full extent of which does not, perhaps, appear on this appeal,—we can conceive of no case of the character of the present which can require, as necessary, the array of counsel who appeared for the plaintiff herein. Of course the "necessity" must be gauged by the services rendered in a cause such as are strictly those of attorney and counselor. Independently of the fact that the order was irregular, in that it provided for a recovery and collection by those not parties to the action, we are

of the opinion the amount was too large, and beyond the legal discretion to be exercised by the court.

This action was commenced November 1, 1883. On the twenty-third day of October, 1883, George W. Tyler, member of the firm of Tyler and Tyler, to whom a fee was allowed by the order above recited, entered into a written agreement with the plaintiff herein, in words and figures following:—

"This agreement, made and entered into this twenty-fourth day of October, 1883, by and between Mrs. William Sharon, formerly Sarah Althea Hill, of the city and county of San Francisco, party of the first part, and George W. Tyler of the same place, party of the second part,—

"Witnesseth, that whereas, about three years ago the party of the first part entered into a contract of marriage with one William Sharon, as provided by the Civil Code of California, no ceremony having been performed; and whereas, said William Sharon is now disposed to repudiate said marriage, and deny its binding force and efficacy; and whereas, said party of the first part has employed said party of the second part to commence and prosecute to final hearing or settlement all such suit or suits as may be necessary to vindicate the good name of the party of the first part, and secure to her a division of the common property of herself and her husband, or a just and suitable provision for her support out of his property, and to defend all such suits as may be brought against her by said Sharon,—

"Now, therefore, it is mutually agreed by and between the parties hereto as follows: The party of the second part, as the attorney of the party of the first part, is to commence and prosecute to final determination, and defend, all such suits as may be brought, or may be necessary or proper, for the complete vindication of the name of the party of the first part, and the enforcement of her rights as against said William Sharon, and is to advance

the money to pay the costs and all ordinary expenses of any litigation that may ensue in carrying out the objects of this agreement, and, as compensation, he is to receive one half of all sums realized or secured to her by such litigation. The party of the second part agrees that he will not settle with said Sharon, or dismiss or compromise any suit or suits that may be brought, without the consent of the party of the first part, obtained, and of her agent, W. M. Neilson. The party of the second part agrees to pay one third of the amount necessary to secure the legal services of D. M. Delmas, or some other person she may desire, as counsel on such litigation, provided his services can be secured for the sum of one thousand dollars.

"The party of the first part agrees to pay the party of the second part one half of all money or property secured from said William Sharon by settlement, promise, or litigation, and said party of the first part agrees not to settle or compromise with said Sharon without the consent of the party of the second part.

"This agreement is executed in duplicate.

" In witness whereof, the parties hereto have hereunto set their hands and seals the day and year first above written. Executed in duplicate.

" October 24, 1883.            "GEO. W. TYLER,
                              "S. A. HILL.

"Witness: F. A. RODNEY."

On the hearing of the motion for alimony and counsel fees, no fact was presented to the court below tending to prove either the incapacity of Mr. Tyler or any indisposition on his part fully to discharge all the obligations assumed by him under his agreement, or that he had in any way failed to perform them. On the contrary, there was evidence that up to that time he had done, with the assistance of others, all he had agreed to do. If he had not, that, perhaps, would have been sufficient reason for not allowing him twenty thousand dollars, or any other sum.

It is not necessary to decide whether, as between the parties, the written agreement is valid and enforceable; and for obvious reasons we express no opinion as to its validity. In *Reynolds* v. *Reynolds*, 67 Cal. 177, this court declined to decide the effect on an order for counsel fees, "of an agreement between plaintiff and her attorney that the latter have, as compensation for his services, a share of the property ultimately recovered." Conceding that the agreement cannot be enforced, in case, as the final result of the litigation, the plaintiff shall realize a share or portion of the community property, the agreement was a fact which should have influenced the action of the court below. If it had appeared at the hearing of the motion that Mr. Tyler, actuated solely by a desire to vindicate justice and the good name of the plaintiff, had promised to prosecute the action without compensation, that he was fully competent and had prosecuted it, the circumstances would show that she had no necessity for money to pay counsel. The question is not whether, as between the parties, counsel ought to be paid, but whether the wife has need of money to prosecute her action.

We can neither assume that plaintiff will, nor that she will not, perform her promise to Mr. Tyler if the event contemplated shall occur. Counsel learned in the law must be supposed to have considered and determined to their own satisfaction whether a contingent arrangement of the character mentioned could be enforced, and to have relied upon the contract or upon the honor of their client to fulfill her promise when she should be in a position to do so. They ought not now to be permitted to say for her, or for themselves, that they are entitled to compensation from another source.

If counsel had abandoned her cause, it might perhaps have been necessary for the court to provide the plaintiff means for securing legal assistance.

We think the order directing the defendant to pay fifty-five thousand dollars counsel fees should be reversed.

In what we shall say with respect to the remaining question,—whether the court below erred in directing the payment to the plaintiff of certain sums as alimony *pendente lite,*—we shall confine ourselves to the points made by counsel for appellant.

In a suit for divorce, when the marriage is denied by the defendant's answer, three things must be made to appear on application for temporary alimony: the marriage,—by satisfactory evidence showing, at least *prima facie,* a marriage in fact; the needs of the party applying for the order; and the "faculties" or ability of the husband to furnish the support ordered. (2 Bishop on Marriage and Divorce, secs. 386, 402.) Evidence of these things has been called "auxiliary proofs"; it is evidence subsidiary to and in support of the order. The making of the order implies a finding of the marriage as to and for the purposes of the order. But it does not determine the issue made by the pleadings, so as in any degree to affect the final judgment. It has been said that it is not necessary to prove the marriage as fully, or the faculties as exactly, on a preliminary application for a temporaay allowance, as will sustain a final decree. (2 Bishop on Marriage and Divorce, sec. 386; *Brinkley* v. *Brinkley,* 50 N. Y. 184.) And it is distinctly to be understood that, in affirming an order for temporary alimony, the court expresses no opinion upon the merits of the main controversy, or as to what should be its final determination. (*Brinkley* v. *Brinkley, supra.*)

It is claimed by appellant that, as the main purpose of the action was to obtain a decree declaring the validity of the alleged marriage, — and the principal issue was marriage or no marriage,—the plaintiff should not have been allowed a support for the time occupied in contesting that issue, and the order was on its face unauthorized, or at least excessive. But the suit was not brought merely to secure a decree declaring the validity of the marriage. The complaint contains all the averments

necessary to a complaint in a suit for divorce, including allegations of causes for a divorce, and it prays for a decree of divorce. In every action for divorce, the marriage must be averred by the plaintiff, and if it be denied by the answer of the defendant, it must be proved. The only fact alleged in the complaint, in addition to the marriage and causes for divorce, is that the defendant had refused to recognize the marriage. But in his answer the defendant denies the marriage. In this state of the pleadings, the allegation that, prior to the commencement of the action, the defendant had denied or refused to recognize the marriage, did not make it necessary for the plaintiff to introduce other or different evidence than such as would have been necessary if the allegation, as to his previous denial of the marriage, had not been inserted. The application for alimony should be treated, therefore, as made in an action for divorce, the marriage being denied by the answer.

It is said by counsel for appellant that, in this case, the court is called on to determine whether "the opinion, judgment, and findings" are sufficient to justify the conclusion of the court below, that the marriage relation existed at the commencement of the action, and thereupon to make the order for temporary alimony.

The order was made February 16, 1885, and the findings and judgment were subsequently filed and entered. The opinion referred to was filed December 24, 1884. It was filed after the trial of the action; refers to and discusses portions of the evidence given at the trial; discusses questions of law arising thereon, and foreshadows the findings to be afterward filed. It is now before us only because incorporated in an affidavit of the defendant, used on the hearing of the motion for alimony and suit money.

It is urged that the opinion clearly shows that, in the mind of the judge below, it was sufficient, to constitute

an unsolemnized marriage, for the parties to enter into
a secret marriage contract, secretly to indulge in sexual
intercourse, etc.; that the court below erred in this view,
and therefore there was no marriage, and the order for
alimony should be reversed.

What has been said with reference to the appeal from
the judgment is, in our view, a sufficient response to
this point.

It is further urged that the order should not have
been made,—or at least the amount allowed is excessive,
—because, in his opinion, the judge below declared that
the plaintiff, as a witness, had sworn falsely to various
matters, and that she had produced and attempted to
introduce in evidence fabricated and forged documents.
If she attempted to support her cause by forged papers,
or by her own perjury, her conduct was evidence tend-
ing to prove an admission of the falsity or fraudulent
character of her claim. And if, as a witness, she will-
fully swore falsely with respect to any material matter,
her whole testimony was to be distrusted, and it was in
the power of the court below to reject all of it. But the
evidence given at the trial is not before us, and we can-
not say how far the testimony of the plaintiff was cor-
roborated as to such of her statements, if any, as were
accepted as true by the court below; nor can we, in the
absence of the evidence given at the trial, say but that,
as to the material issues, the evidence may have been
sufficient to sustain the conclusion reached by the judge
in his opinion, even after rejecting all the testimony of
the plaintiff, and giving due weight to the discredit cast
upon her claim by her resort to fraud in maintaining it.

We cannot say, as the case comes to us, the court
should have allowed nothing as alimony.

Nevertheless the evidence before the court below, when
the order for alimony was made, shows that the fact of
marriage was warmly contested, and that the alleged
marriage was not made public. As appears from the

opinion, the plaintiff had testified that when "the contract" was signed the defendant had agreed to let her have five hundred dollars a month for her expenses. His payments to her always aggregated at least five hundred dollars; but "in many instances," the sums given during a month were largely in excess of five hundred dollars. Conceding that, for the purposes of the order, the implied finding of the marriage should be held conclusive on this appeal, the actual conditions should have been considered in fixing the *amount* of the temporary allowance.

The order for temporary alimony always precedes the final judgment. After the decree for divorce is granted for the offense of the husband, the court may compel the husband to make a suitable allowance to the wife for her support during her life, etc. (Civ. Code, sec. 139.) And if a dissolution of the marriage be decreed, on the ground of the adultery or extreme cruelty of the husband, the community property may be assigned to the parties in such proportions as the court may deem proper. (Civ. Code, sec. 146.) The order for permanent alimony may provide for the payment of the allowance from the appearance of the defendant in the action, or from its commencement. ( *Wilson* v. *Wilson*, 45 Cal. 402.)

Temporary alimony should, of course, under all ordinary circumstances, be less than permanent alimony. It is not given as the ultimate award of justice, but as a needful step in the course of ascertaining what justice demands. (2 Bishop on Marriage and Divorce, sec. 458.)

No uniform rule can be laid down with respect to the amount to be allowed for support *pendente lite*. The husband's income is but one of the elements entering into the inquiry. Mr. Bishop says a common rule of the English ecclesiastical courts is "subject to variations," to allow for temporary alimony about one fifth of the joint income, though the proportion will vary according to circumstances,—sometimes as little as one eighth being given,—and that the English practice has been generally

followed in this country. (2 Bishop on Marriage and Divorce, secs. 455, 457, 460.) An examination of the cases in which such general statements are made shows that they were cases in which the marriage was not disputed.

On the other hand, in New York, even where the marriage is admitted, a wife proceeding against the husband is, according to some of the judicial decisions there, allowed in general no more than will meet her actual wants; the object of the rule being to discourage vexatious suits, and other like abuses, and to prevent indiscreet friends from fomenting family quarrels. Mr. Bishop says of the New York practice: "A yet stronger claim to favor is its admirable equity, when with it another rule, sometimes resorted to in this state, is permitted to operate; namely, to let the permanent alimony commence from the date of the suit, deducting from it the temporary alimony already paid." (2 Bishop on Marriage and Divorce, sec. 461.) As we have seen in California the decree for permanent alimony may provide for its payment from a date anterior to the order.

But without adopting the New York rule in its strictness, it seems very clear that the amount of temporary alimony named in the order appealed from is excessive.

Where the income of the husband is very large, and the parties have publicly lived together in a style conformable to such income, a just allowance would seem to be one sufficient to enable the wife to continue the enjoyment of many luxuries which habit has made apparent necessities; this, however, subject to the limitation, that, while her suit is pending, she is to live in the discreet and quiet manner appropriate to one whose domestic relations are being made the subject of public investigation, and without expenditures for mere display or the gratification of personal vanity.

In the case now here the plaintiff never enjoyed a portion of the defendant's income accordant with the posi-

tion of his recognized wife. Assuming every fact in her favor, she was, at the commencement of their relations, willing that the marriage should be kept secret for a definite time, and, during that period, to live in comparative obscurity upon an allowance of five hundred dollars a month. That large sum (however small a portion of the defendant's actual income) was amply sufficient for her comfortable support, and to supply her with many of the appliances of wealth. An order providing for the continuance during the pendency of the action of the sum that the defendant had agreed to pay her during their cohabitation, and until their marriage should be made public, would surely have provided for her reasonable, not to say liberal, support; whatever was more than reasonable was excessive. The discretion of the court below is a *legal* discretion, to be reasonably exercised. "Abuse of discretion" in making such orders does not necessarily imply a willful abuse, or intentional wrong. In a legal sense, discretion is abused whenever, in its exercise, a court exceeds the bounds of reason,—all the circumstances before it being considered.

An application for temporary alimony may be made at any time,—at least after answer. The fact that, in this case, the application was made so late does not alter the principle on which it is to be determined. Ordinarily, when the application is heard, the ultimate decree cannot be anticipated, — the plaintiff may fail to establish any cause of action. When the marriage is denied, although the marriage may be shown *prima facie* on the hearing of the motion, it is unreasonable to allow the wife, for her support *pendente lite,* not only more than is necessary to supply her actual wants, but more than the defendant agreed to pay her until the marraige should be openly acknowledged, that sum being fully sufficient to secure every comfort and many of the luxuries of life.

The judgment appealed from (entered on the nineteenth day of February, A. D. 1885) is affirmed. The judgment

or order appealed from (made and entered the sixteenth day of February, 1885), directing the payment of alimony to the plaintiff and the payment of counsel fees, is modified by striking out therefrom the words "the sum of seven thousand five hundred dollars as alimony herein, and the further sum of two thousand five hundred dollars on or before the eighth day of April, 1885," and inserting in the stead and place of those words "the sum of one thousand five hundred dollars as alimony herein, and the further sum of five hundred dollars on or before the eighth day of April, 1885." And the judgment or order appealed from (so as aforesaid made and entered on the sixteenth day of February, 1885) is further modified by striking out therefrom the portion thereof which reads: "It is further ordered that the defendant pay as counsel fees herein, on or before the ninth day of March, 1885, the sum of *fifty-five thousand dollars;* that is to say,—twenty thousand dollars to Messrs. Tyler and Tyler, *or order;* ten thousand dollars to George Flournoy, *or order;* ten thousand dollars to Walter Levy, *or order;* ten thousand dollars to David S. Terry, *or order;* and five thousand dollars to R. P. Clement, *or order;* and in case any of such payments are not made on or before the time herein fixed, then the *party or parties* entitled thereto *shall have execution* therefor, pursuant to section 1007 of the Code of Civil Procedure of the state of California"; and the portion of said order of February 16, 1885, so as aforesaid providing for the payment of counsel fees is hereby reversed.

TEMPLE, J., SEARLS, C. J., and PATERSON, J., concurred.

TEMPLE, J., concurring.—I have concurred in the prevailing opinion, and I add:—

The main question is a pure question of law. Do these facts constitute marriage?

Persons capable of marriage consented to present mar-

riage.    Thereafter they cohabited in the way usual with
married persons for more than one year, during which
time they mutually assumed towards each other marital
rights, duties, and obligations.    The cohabitation and
supposed marriage, was, however, kept a secret, pur-
suant to an agreement in writing made at the time of
the mutual consent to present marriage.

But for the secrecy there would be no doubt as to the
validity of the marriage.    Does that render the marriage
void?

This depends entirely upon our statute.    Section 55,
Civil Code, is as follows:—

"SEC. 55.  Marriage is a personal relation arising out
of  a  civil  contract  to  which  the  consent  of  parties
capable of making it is necessary.    Consent alone will
not constitute marriage; it must be followed by a sol-
emnization, or by a mutual assumption of marital rights,
duties, or obligations."

It is claimed that the words "the mutual assumption
of marital rights, duties, or obligations" implies the pub-
lic assumption of the relation.    Such is certainly not
the natural and obvious meaning of the language.    That
would naturally, and in the absence of any preconceived
idea upon the subject, be held to mean only that the par-
ties must not only agree to present marriage but must
by some act or deed take upon themselves the duties and
rights of the relation.    The language is exactly adapted
to express the necessity of actually taking upon them-
selves contract obligations.    However it may be looked
upon from other points of view, in law marriage is re-
garded simply as a relation arising from civil contract.
It is so declared in this very section.    Perhaps we should
be able to appreciate the force of the language better
if we substitute for marriage some other well-known con-
tract relation.    For instance, "Partnership is a personal
relation arising out of a civil contract, to which the con-
sent of parties capable of making it is necessary.    Consent

alone will not constitute partnership; it must be followed by a mutual assumption of partnership rights, duties, or obligations."

Had there been a section of the code to this effect, would any one doubt its meaning? It would mean simply that an agreement to be partners was not sufficient to constitute partnership until it was followed by the actual commencement of partnership business.

It seems to me this illustration shows that the language of the section is exactly adapted to the purpose intended, and that, as I have said, it is only when read with the preconceived idea that it ought to mean something else that it seems to be inexact or ambiguous.

And it may be added that in the case supposed, there would be nothing inconsistent with the assumption of partnership rights, duties, or obligations, *inter sese,* if the relation were kept secret or even denied. A secret partner assumes the duties and obligations of the relation. The only trouble is in the matter of proof. There is no necessary relation between the assumption of contract rights and duties, and publicity.

This construction will be understood when we remember there were two species of marriage at common law, by mere act of the parties, *per verba de præsenti* merely, or *per verba de futuro cum copula,* and there were those who contended that marriage *per verba de præsenti* must also be *cum copula subsequente.* The legislature plainly intended to adopt the view that the agreement to present marriage must be followed by consummation, which, however, might consist of any conduct which would show that the parties had actually entered upon the married state.

This is made still more obvious by section 57 of the Civil Code. The word "consummation" was avoided in section 55, because it has come to be a euphemism for the more indelicate word *copula,* and thereby has acquired a more narrow meaning than was intended.

Therefore the phrase which only indicates the assumption of the contract relation was used. But in section 57 the word "consummation" is substituted for the phrase. It cannot mislead here, for it has been defined, but it shows that the mutual assumption of marital rights, duties, or obligations is of the nature of consummation,—something in the nature of part performance of the consent to present marriage; though that is not limited to the *copula*.

"SEC. 57. Consent and consummation may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases."

Subsequent consummation as well as consent may be manifested in any form. What can this mean except exactly what I have claimed for it? And if in any form, why not by secret cohabitation, where the husband claims the right, believing himself a husband, and the wife submits because she believes herself a wife?

It is contended that the use of the word "manifested" in this section indicates that it must be made known,—that it cannot be secret.

But this is a total misapprehension of the office of the section. It is simply and only to provide a mode of proving a private marriage, and the word "manifested" has reference to proof. To illustrate: Suppose in this case the plaintiff had testified in her own behalf in general words: "Defendant and myself each agreed to present marriage, and we subsequently consummated it." It would then be natural to ask, "You say the defendant consented to marriage with you,—how did he manifest that consent; what did he say, etc.?" This shows what to my mind is the plain, obvious, and only meaning of the word in this section. It means manifested for the purposes of proof, whenever the fact may come in issue. A private marriage must still be capable of proof, otherwise it is practically no marriage. In fact, the provisions of our statute with reference to solemnization are

mainly, if not entirely, to provide means of proof, and not for the purpose of publicity.

If it had been intended to require publicity, the addition of one word would have removed all doubt. On the contrary, the language is exactly adapted to express the mere assumption of contract obligations.

It seems to me it is rather late in the Christian era to claim that a secret marriage, or a contemporaneous agreement to keep the marriage secret, is opposed to good morals or public policy in any sense, which will render the marriage, otherwise contracted according to the law of the land, void.

By the Justinian code in the sixth century, it was expressly provided that the mere consent of the parties should be sufficient to constitute marriage, except as to persons of rank. Such marriages have been held valid throughout christendom ever since, with some few exceptions made by positive law, within the past two centuries. It goes without saying that there have always been secret marriages. They have always been condemned by the church and by the courts. And yet they have always been held legal. It is, I think, safe to say that there is not a case in any country in christendom in which a marriage has been held void merely because it was kept a secret, or because of a contemporaneous agreement of secrecy. And no law-writer has ever suggested this as a possible cause of invalidity.

Our ancestors seem to have realized the strength of the passion they were attempting to regulate. They knew there would always be irregular unions, and they evidently thought it in the interest of good morals and good public policy to bring as many of these relations as possible within the regulative force of law, and the courts have always inclined to the validity of marriages in favor of the legitimacy of offspring.

A secret marriage is not necessarily clandestine or irregular. The most regular marriage and one duly

solemnized may be secret. Under our statute, consent and consummation are in all respects the equivalent of solemnization. The law requires a solemnized marriage to be recorded, but if not recorded, and if in fact kept secret, no one would doubt its validity. The issue of the license does not prove a marriage, and of course cannot give it publicity. Many licenses issue where no marriage follows.

Repute,—the holding out to the world,—living in the the face of their neighbors as husband and wife, is evidence of marriage without proof of solemnization. It appears to me that much confusion arises right here. It is tacitly, perhaps unconsciously, assumed that the marriage thus proved is marriage by mere consent; and then the proposition is reversed, and it is claimed that marriage by consent and consummation can be proved only by repute; that it is not marriage unless followed by publicity.

This idea, although not expressed, is, I think, implicit in all the arguments in favor of the necessity of publicity. But in the first place, the marriage presumed from repute may as well be one by solemnization as by the mere act of the parties. In the next place, our statute makes a marriage by consent with consummation the equivalent in all respects with marriage by solemnization. And finally, this view is expressly and *ex industria* negatived by our statute, which provides that consent and consummation may be manifested in any form. It need not be by repute, nor by the *copula*, nor by support and cohabitation, nor by the recognition of children as legitimate, but it may be by any of these modes, or by any other act in addition to mere consent which manifests an actual entering upon the relation.

And I think it will be found that all the cases which seem to insist upon some degree of publicity are cases of presumed marriages without direct proof. It is admitted that to *establish* marriage in that mode, publicity to some

extent is required. But the exigency of appellant's argument is a case where an actual marriage being proven it was held invalid because kept secret.

But we are not without authority upon the effect of secrecy,— the marriage being otherwise valid. *Dalrymple* v. *Dalrymple*, 4 Eng. Ecc. 485, was decided by Lord Stowell, perhaps the very highest authority upon questions of this character. The case arose under the Scotch law, which is on this point exactly the law of California; that is, consent and consummation were sufficient without solemnization. The parties so married, but at the time of the consent the wife also stipulated in writing to keep the marriage secret. The marriage was in fact kept secret for nearly four years, when the husband married again. The second marriage was held void. Lord Stowell remarks as to the agreement of secrecy: —

" An engagement of secrecy is perfectly consistent with the most valid and even with the most regular marriages. It frequently exists even in them from prudential reasons; from the same motive it almost always does in private or clandestine marriages. It is only an evidence against the existence of a marriage, when no such prudential reasons can be assigned for it, and where every thing, arising from the very nature of the marriage, calls for its publication."

This last suggestion, it seems to me, contains all there is in the matter of secrecy. It is merely an important fact in the proof of the marriage. This case strikingly illustrates this: The plaintiff by this agreement certainly placed herself in a most trying situation. Had the secret cohabitation been discovered, her mouth would have been hermetically sealed for at least twelve calendar months to any explanation of the most compromising circumstance. She might have become a mother, and have been for the same period unable to deny the bastardy of her child and her own disgrace. And had either event happened, her silence would have rendered

it extremely difficult ever after to establish her wifehood. These undeniable difficulties in her case seem not only to create a prejudice against the case, but against the law under which the validity of the marriage is claimed, and have constituted, in my opinion, no small part of the force of appellant's argument here. These facts were entitled to great weight in the court below, and no doubt received due consideration, and yet the plaintiff was found to be very wife.

The evidence is not before us, only the facts as found constituting consent and consummation. We can imagine that one might make even this tremendous sacrifice to compass a desirable marriage, and that she might confide in her husband to protect her reputation. At any rate, it is not for us on this appeal to estimate probabilities, but to pronounce the judgment of the law upon admitted facts.

THORNTON, J., dissenting.—Appeal from the judgment declaring a marriage, and for a divorce.

I dissent. Let it be admitted that marriage at common law might be consummated by words of present contract, or *per verba in futuro cum copula*, still the validity of a marriage in this state since the codes went into effect must be determined by the provisions of the Civil Code. This code has ample provisions on the subject of marriage; and it is declared in section 4 that it "establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed, with a view to effect its objects and to promote justice." It is further declared in the same section that "the rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code." The clause last quoted immediately precedes the one first quoted.

" Derogation " is defined by Webster to be "the act of annulling or breaking a law, or some part of it. More generally, the act of taking away or destroying the value

or effect of anything, or of limiting its extent, or of restraining its operation; as, an act of Parliament is passed in *derogation* of the king's prerogative; we cannot do anything in derogation of the moral law."

Whatever meaning we may attribute to the word "derogation" in the first clause of the section referred to, so far as the code annuls or changes the common law, its provisions must be not strictly but liberally construed, to effect its objects and to promote justice.

The object of a law is the end or purpose for which it was enacted. Such end or purpose must be deduced from the words employed in the statute; and when such end or purpose can be deduced from the law, its provisions are to be liberally construed to effect such end or purpose. We do not understand by this language that words are to be construed so as to give them a strained meaning,—a meaning which the words on a reasonable interpretation cannot bear; in fact, the language of the fourth section is controlled by the thirteenth section of the code, which declares that "words and phrases are construed according to the context and the approved usage of the language; and in the case of technical words and phrases, or such others as may have acquired a peculiar and appropriate meaning in law, or the meaning defined by statute, they are to be construed according to such peculiar and appropriate meaning or definition."

The fifty-fifth section of the Civil Code defines marriage and what shall constitute it.

In the first clause of the section, marriage is defined thus: "Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary." As to what shall constitute the relation of marriage, these words are used: "Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties, or obligations." The words "mari-

tal rights, duties, or obligations " have some meaning. We cannot presume that such words were idly used by the law-making power, or that they used unmeaning words. We must first find that they are meaningless before we can reject them as entitled to no weight in arriving at the meaning of the statute. Whatever the meaning of these words, it is something additional to the consent spoken of in the first clause of the section. If anything is added, the rule of the common law is changed, and a new rule is established.

At the common law there could be no valid marriage without consent. In the case where the nuptial contract is made by present words, the consent was manifested by express words; in the case of a union where there was not this express consent, the consent to marry was deduced from circumstances, either from cohabitation, or from cohabitation and the various acts accompanying the marriage state, which may be designated as its *res gestæ* or *indicia.*

We think that the above rule can be positively declared to exist as a part of the common law, viz.: that there can be no valid marriage at common law without consent to marry. The consent between the contracting parties constituted the marriage. Whether there was such consent when the marriage is denied, and becomes a subject of judicial investigation, between the parties to a cause, must be established by proof. In the one case it is shown by express declaration or unequivocal acts; in the other, it has to be implied or deduced from circumstances. When such consent was found to exist, the marriage was held to have been constituted.

Now, if anything is added by the section referred to, to consent, the common law is changed. How far changed we do not say here. It may not be necessary to say how far these words change the rule of the common law,—to define, point out, and limit the extent of the change made.

It is the better course to leave each case as it arises, to

be determined on the peculiar facts or circumstances presented by it.

"Consummating marriage" and "consummation of marriage" are mentioned in the sections immediately following the section first quoted; the first form of words is employed in the fifty-sixth and the latter form in the fifty-seventh section.

Conceding that at common law a marriage was consummated by sexual intercourse, we cannot understand these words as having that meaning in the fifty-sixth and fifty-seventh sections. The consummation referred to in them is, we think, the assumption by each of the contracting parties following consent, of the marital rights, duties, or obligations. The declaration in the fifty-fifth section that consent alone will not constitute marriage, but it must be followed where there is no solemnization by a mutual assumption of the marital rights, duties, or obligations, is, in effect, declaring the consummation referred to must be the mutual assumption of the marital rights, duties, or obligations. Sexual intercourse may be an element in such assumption, but it is not all of it. In our judgment, in a case of consent to marry, followed by sexual intercourse merely, without living together, the mutual assumption required by law is not indicated. If consent and sexual intercourse alone constituted marriage, then a single act of such intercourse, immediately after which the parties separated, each party going his own way and never meeting the other again, would be such an assumption as the law required. We cannot think that such is or can be the meaning of the law in this state, as declared in the fifty-fifth section of the Civil Code.

After a careful consideration of the findings in this case, we discern that the following facts are found:—

That the parties had the residence in the city and county of San Francisco required by law, prior to the action herein; that on the 25th of August, 1880, they

consented in writing, actually signed by them, to inter-
marry; that afterwards, some time in September, 1880,
they commenced living and cohabiting together in the
way usual with married people, although their cohabi-
tation was kept secret, and so continued for the space of
more than one year, and down to the twenty-fifth day
of November, 1881, and that during all of said time the
parties mutually assumed toward each other marital
rights, duties, and obligations; that during all of the
same time plaintiff and defendant so lived together, de-
fendant visited her relations with her, escorted her to
places of amusement, and introduced her to respectable
families and members of his own family, and wrote to
her several letters, while absent from her, in which he
addressed her as "My dear wife"; that the marriage was
never solemnized, and the consent in writing to inter-
marry was not a declaration made in compliance with
section 75 of the Civil Code of this state; that defendant,
on or about December 6, 1881, drove plaintiff from her
apartments in his hotel, in which she had resided by his
directions since September, 1880, and which was the
residence selected for her by defendant, refused to longer
live with or provide for her support, and has not since
then lived with or sought to live with, or requested the
plaintiff to return or live with him, or provided in any
manner for her support; that plaintiff's real name is
Sarah Althea Sharon, and that she has not falsely or
fraudulently assumed it; that defendant never introduced
plaintiff as his wife or spoke of her as such in the pres-
ence of other persons; that plaintiff never introduced
defendant as her husband, nor spoke to him or of him
to other persons in his presence as her husband; that
the parties were never reputed among their mutual
friends to be husband and wife, nor was there at any
time any mutual, open recognition of such relationship
by the parties; nor any public assumption by the parties
of the relation of husband and wife.   The written consent

to marry, above referred to, contains an agreement by plaintiff not to make known the contents of such writing or its existence for two years, unless the defendant himself shall see fit to make it known.

It will be observed that the veil of secrecy covers all the acts of the parties which pertained to the alleged marriage. Their entire intercourse is hidden and concealed, except when they visited together or attended places of amusement. They lived together secretly. Such we understand to be the meaning of the finding that their cohabitation was kept secret, inasmuch as living together and cohabitation mean the same thing. By no act of the parties were marital relations indicated to other persons, not even to their mutual friends and associates. They never addressed each other as husband or wife in the presence of any person; never spoke of each other as husband or wife to any person, nor was this relation known or indicated by any act to any person whatever. The lives of the parties were, during every moment of the period referred to in the findings, an assertion that the relation of husband and wife did not exist between them.

It is not even found, and therefore does not appear, that defendant supported plaintiff. The finding on this point is that defendant, some time in 1881, drove plaintiff *from her apartments in his hotel,* in which she had resided by his directions since September, 1880, and which was the residence selected for her by the defendant, and refused to longer live with her or provide for her support. The finding that he supported her prior to this time can only be implied from the words "refused to longer live with her or provide for her support." Such a finding as this is not sufficient. The fact of support prior to the time when he drove her from her apartments in his hotel must not be left to implication. The fact of previous support must be distinctly found, or it cannot be held and acted upon here as a fact which existed. (See *Birckhead*

v. *Brown*, 5 Hill, 634, and Broome's Legal Maxims, on the rule, *De non apparentibus et de non existentibus eadem est ratis.*) It is not even found that the parties had a common home. The statement in the finding is that defendant drove plaintiff, not from the common apartments of both parties, but *from her apartments.*

It does not appear that plaintiff ever at any time addressed defendant as her husband, or assumed his name during the period of such cohabitation mentioned in the findings. Under the rule for construing findings of fact, we must hold that facts not found never existed. If she had a right to be called by the name of the plaintiff, she never assumed or claimed that right during the period commencing with the 25th of August, 1880, and ending with the 6th of December, 1881. In fact, it does not appear when she assumed the name of plaintiff, or claimed a right to be called by his name. She not only did not assume or claim this right, but her conduct was such as to amount to a non-claim of any such right. She was never known or called by the name of plaintiff during the period of time to which the findings refer; and though it is found that defendant, during the time that he and plaintiff "so lived together," wrote her several letters in which he addressed her as "My dear wife," it does not appear that she ever addressed defendant as her husband, either orally or in writing.

We cannot understand that a mutual assumption of marital rights, duties, and obligations can be otherwise than open to view,—at least, open to the view of the mutual friends and associates of the parties. We do not mean by this that such assumption must be carefully and studiously made public, but persons must manifest such assumption by that open, visible, and undisguised living together, such as is usually practiced by persons holding toward each other the relation of husband and wife. When the statute enacts that the subsequent consummation of marriage may be manifested in any form

(Civ. Code, sec. 57), its meaning is that it must be done in a form which manifests or shows such consummation, —that is, manifests the assumptions of marital rights, duties, and obligations; that the conduct of the parties and their intercourse with each other must be of a character which shows that they have mutually assumed the rights and duties of husband and wife.

The general finding that during all of said time the plaintiff and defendant mutually assumed toward each other marital rights, duties, and obligations amounts to nothing when it is also found that plaintiff never was known as or called by the name of her husband; that defendant never introduced plaintiff as his wife, nor spoke of her as such in the presence of other persons; that plaintiff never introduced defendant as her husband, nor spoke to him nor of him as her husband in the presence of other persons, or in his presence; that the parties never were reputed among their mutual friends to be husband and wife; nor was there at any time any mutual, open recognition of the relation of husband and wife by the parties; that their whole intercourse with each other was kept hidden from the view of every one; that defendant never supported plaintiff, nor contributed any further to her support than to furnish her apartments in his hotel in which she resided; that she never assumed or claimed the right to assume his name.  Of such circumstances, though defendant did write plaintiff letters during the period mentioned above, in which he addressed her as "My dear wife," it cannot be held as matter of law that there was ever a mutual assumption by the parties of marital rights, duties, or obligations.

It follows from the above that marriage was never consummated by the parties in this cause, and that plaintiff and defendant were never, according to the laws of this state, married, or sustained toward each other the relation of husband and wife.

We are of opinion that the judgment in favor of plain-

tiff,. adjudging a marriage and for divorce, should be reversed, and judgment ordered for defendant.

As in our opinion there was no marriage, there can be no order for alimony and counsel fees. The judgment or order for alimony and counsel fees should therefore be reversed.

SHARPSTEIN, J., concurred in the opinion of MR. JUSTICE THORNTON.

McFARLAND, J., dissenting.—I dissent. The complaint avers a marriage between plaintiff and defendant, and various acts of defendant constituting causes of divorce. The answer denies the marriage. It was admitted that if there was a marriage a divorce should follow; so that the real contest in the case was as to the existence of the marriage. The court below made and filed its findings, adjudged that the parties were. husband and wife, and decreed a divorce, with one half of the common property, etc. From the judgment the defendant appealed. (Since the trial in the lower court the defendant died, and his executor has been substituted as appellant.) With the sufficiency of the evidence in the case to justify the decision of the court below, we have nothing to do on this appeal.

The full "findings of fact" (so called) of the court are as follows:—

"1. That for more than six months prior to the commencement of this suit the plaintiff and defendant were residents of the city and county of San Francisco, state of California.

"2. That on the twenty-fifth day of August, A. D. 1880, the plaintiff and defendant each signed a certain declaration of marriage in the words and figures following, to wit:—

"'In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, Sarah Althea Hill of the city and county of San Fran-

cisco, state of California, age twenty-seven years, do here, in the presence of Almighty God, take Senator William Sharon, of the state of Nevada, to be my lawful and wedded husband, and do here acknowledge and declare myself to be the wife of Senator William Sharon, of the state of Nevada.        Sarah Althea Hill.

"'August 25, 1880, San Francisco, Cal.

"'I agree not to make known the contents of this paper or its existence for two years, unless Mr. Sharon himself see fit to make it known.        S. A. Hill.

"'In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, William Sharon, of the state of Nevada, aged sixty years, do here, in the presence of Almighty God, take Sarah Althea Hill, of the city and county of San Francisco, California, to be my lawful and wedded wife, do here acknowledge myself to be the husband of Sarah Althea Hill.        William Sharon, Nevada.

"'August 25, 1880.'

"Which was the only written declaration, contract, or agreement of marriage ever entered into between said parties, and at the time of signing said declaration, plaintiff and defendant mutually agreed to take each other as, and henceforth to be to each other, husband and wife.

"3. That afterwards, and about the —— day of September, 1880, the plaintiff and defendant commenced living and cohabiting together in the way usual with married people, although their cohabitation was kept secret, and so continued for the space of more than one year, and down to the twenty-fifth day of November, 1881, and during all of said time the plaintiff and defendant mutually assumed towards each other marital rights, duties, and obligations.

"4. That during all the time plaintiff and defendant so lived together, defendant visited her relations with her, escorted her to places of amusement, and introduced

her to respectable families and to members of his own family, and wrote to her several letters while absent from her, in which he addressed her as 'My dear wife.'

"5. From the foregoing facts the court finds that plaintiff and defendant intermarried in August, 1880, and that the allegations of paragraphs 2 and 3 of the complaint as to the fact of marriage are true, except in so far as the declaration therein referred to is alleged to be in compliance with section 75 of the Civil Code of this state.

"6. That defendant, on or about December 6, 1881, drove plaintiff from her apartments in his hotel, where she had resided by his directions since September, 1880, and which was the residence selected for her by the defendant, refused to longer live with her or provide for her support, and has not since then lived with or sought to live with or provide for her support, and has not since sought to live with or requested the plaintiff to return or live with him, or provided in any manner for her support.

"7. That no proof was offered of either charge of adultery in the complaint, the same being on the trial deemed withdrawn by mutual consent.

"8. That it is not true, as stated in the answer of defendant, that plaintiff has either falsely or fraudulently assumed the name of Sarah Althea Sharon, but on the contrary, that it is her real name; nor is it true that she, or any one, forged the document mentioned in the complaint and heretofore set out; on the contrary, the said document is genuine, and was signed by the plaintiff and defendant at the time it purports to have been signed.

"9. That defendant never introduced plaintiff as his wife, nor spoke of her as such in the presence of other persons; that plaintiff never introduced defendant as her husband, nor spoke to nor of him to other persons as her husband; that the parties were never reputed among their mutual friends to be husband and wife, nor was

there at any time any mutual, open recognition of such relationship by the parties, nor any public assumption by the parties of the relation of husband and wife."

It will be observed at once that in these findings there is a confused intermingling of matters of fact and matters of law; that many of them include statements which are either clear conclusions of law, or general inferences and deductions which are difficult of assignment to the category of either law or fact; and that, to a great extent, they are inconsistent with each other. For instance, what is the meaning of that part of the third finding which says that the parties lived together "in the way usual with married people," when read in the light of the ninth finding? The court below can hardly be understood as intending to say that the way of life of these parties as described in the ninth finding was "the way usual with married people." And if it is to be so understood, is the finding to be taken as one of fact or one of law? Must a conclusion or opinion about a general custom of the country be received as a specific finding of fact? Is the statement in the third finding, that plaintiff and defendant "assumed toward each other marital rights, duties, and obligations," to be taken as conclusive if the facts specifically found show the contrary?

It is not difficult, however, to see in these findings what actual *facts* are found, and what are not found, and to segregate those parts which are merely indefinite generalities, containing conclusions, opinions, and inferences, but *not facts*. And the case must be decided by the application of the law to the actual facts which appear upon the face of the findings.

These facts are briefly as follows: The parties had the required residence where the suit was brought. On the twenty-fifth day of August, 1880, they executed the written instrument set forth in the second finding. For more than a year from that date they had secret sexual intercourse. During that time plaintiff, by defendant's

directions, occupied apartments in defendant's hotel. During that time, also, defendant visited plaintiff's relations with her, escorted her to places of amusement, and introduced her to respectable families and to members of his own family,—all the time *introducing her as a single, unmarried woman.* (The italicized part of the last sentence is clearly found; because while the fourth finding states that he *did* introduce her, etc., the ninth finding specifically states that he *never* introduced her *as his wife,* or spoke of her as such.)  Defendant also, during this time, wrote to plaintiff "several letters," *in which* he addressed her as " My dear wife." It does not appear affirmatively that he furnished her money or other support than the apartments in the hotel in which she resided.  She never during this time took or was known by his name.  About December 8, 1881, he "drove plaintiff from her apartments in his hotel." It does not appear that at that time she asserted her claim as wife. And during all this time it appears, as stated in the ninth finding, "that defendant never introduced plaintiff as his wife, nor spoke of her as such in the presence of other persons; that plaintiff never introduced defendant as her husband, nor spoke *to nor of* him to other persons in his presence as her husband; that the parties were never reputed among their mutual friends to be husband and wife, nor was there at any time any mutual, open recognition of such relationship by the parties, nor any public assumption by the parties of the relation of husband and wife." During the period mentioned their whole lives, conduct, and deportment constituted, except secretly between themselves, a direct and continued repudiation and disavowal of the marital relation.  It does not appear if any person ever imputed to either of them that relation (indeed, it does not appear that their marriage was ever suspected); but if such imputation was ever made, it must, of course, have been met with a denial.

The court below came to the conclusion that these facts constituted a valid marriage under the laws of this state; and the question to be determined is, Was that conclusion right or not?

We are aided but little in determining this question by inquiring what the law of England was upon the subject fifty or a hundred years ago. Jurisprudence here is not called upon to stand with drawn sword among the broken arches and prostrate columns of old common law, and defend them from fancied attacks of the legislature. There is no rule here that statutes derogatory of the common law are to be strictly construed. The code itself prescribes the rule upon the subject in the following language: —

" The rule of the common law that statutes in derogation thereof are to be strictly construed has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed to effect its objects and to promote justice." (Civ. Code, sec. 5.)

And the code treats of marriage fully and in great detail, and " establishes the law " upon that subject.

But, as counsel have discussed with great learning and ability the requisites of a valid common-law marriage, we may say, in passing by the subject, that it is by no means clear that at any time in England a present contract followed by nothing more than secret sexual intercourse constituted a perfect marriage at common law. There are innumerable authorities upon the subject, and they greatly conflict. In some cases the law is strained in favor of the legitimacy of children, and of persons criminally charged. But in cases like the one at bar, of direct attempts to establish marriage, the weight of authorities seem to be against the positions taken by respondent. Whoever shall closely study the arguments and authorities presented in the elaborate report of the celebrated case of the *Queen* v. *Millis*, 10 Clark & F. 534,

will see most cogent reasons for agreeing with the unanimous conclusion to which the judges came in that case. And that conclusion was to this effect: that with respect to the requisites of a valid marriage, the common law followed the ecclesiastical law,—not the general canon law of Europe, but the "king's ecclesiastical law," as established and administered in England; that whatever the latter provided the former required; and that at no time did the ecclesiastical law hold a marriage valid unless performed in the presence of an ordained minister. Lord Chief Justice Tindal, in delivering the opinion, says: "And with respect to the decisions of the courts of law, and the other common-law authorities, if no case can be referred to directly and distinctly laying it down as law in so many words, that a contract *per verba de præsenti* alone, and without the intervention of a minister in orders, is not -sufficient to create a valid and complete marriage, yet such conclusion is necessary from many of the decided cases, and is inconsistent with none; nor in fact could the difficulty to be determined in any of the cases ever have existed, except upon the supposition that some religious ceremony was necessary to the contract; thus leading to the conclusion above laid down, that by the law of England the contract *per verba de præsenti* alone did not constitute a full and complete marriage."

There are numerous authorities to the same effect; although there are others which hold, or seem to hold, differently. But the *Queen* v. *Millis* presents the fullest discussion of the question which we have been able to find. It is said that the common law looked upon marriage as a civil rather than a religious institution. That may be true; but as it always followed the ecclesiastical law, and as the latter always required a celebration in the face of the church, thus, as a matter of fact, the common law always did employ a machinery which worked the *publicity* of marriages. Whether, if the ecclesiastical

rule had not been adopted, some other method of publicity would have grown up with the common law, cannot be known but may be presumed. And it is rare, indeed, to find a case at common law where *any* respectable court has held a marriage entirely secret to be valid. In the *Queen* v. *Millis*, the attorney-general and the solicitor-general were contending for the validity of the marriage there in question, where the ceremony was performed by a Presbyterian preacher, and not by a minister of the established church; and in nearly every authority cited by them there had been an agreement of marriage before witnesses, and generally some form of religious ceremony. And it must be remembered that the "clandestine marriage" referred to in the authorities was by no means a secret marriage; it was a marriage entered into before witnesses, usually with an irregular ceremony,— without the publication of banns, and lacking other requisites of the ecclesiastical law. Even the Fleet and Gretna Green marriages were not secret.

But if it were admitted that the common law was what the counsel for respondent claim it to have been, what consequences important in the decision of the case at bar would flow from such admission? Take, for instance, the doctrine of the case of *Dalrymple* v. *Dalrymple*, so much relied on by respondent (4 Eng. Ecc. 485), which case, however, was held in *Queen* v. *Millis* to be only declaratory of the loose Scotch law of marriage, and to be incorrect so far as it undertook to state the law of England. The doctrine of the Dalrymple case is that present mutual consent to be married does, of itself, at common law, constitute marriage, whether followed by any other act or not. Now, of what value is such an authority here, even if it be taken as a correct statement of the common law, in face of an express provision (as we shall see) of the statute law of California that "consent alone will not constitute marriage."

Let us see, then, what the law of marriage in this state

is. It may be first remarked, however, that under all
the authorities, and from the very nature of the relation,
marriage is something more than a contract. It is a
civil condition. Bishop defines it as "the civil *status* of
one man and one woman united in law for life for the
discharge to each other, *and the community*, of the duties
legally incumbent on those whose association is founded
on the distinction of sex." (1 Bishop on Marriage and
Divorce, sec. 3.) Husband and wife owe a duty to
society, as well as to each other. Except as to prop-
erty they cannot, either before or after marriage, settle or
merge, or modify, their rights or obligations. Neither
can end the relation by notice; and a disregard of mar-
riage obligations by one does not give a right of action
for damages for breach of contract to the other. Their
rights and obligations come, not from any contract be-
tween themselves, but from the law. They are changed
by a change of the law, or by a change of residence to a
place where the law is different. The divorce laws which
happened to exist at the time the relation is entered into
do not form "part of the contract." If the legislature
should at its next session repeal all laws granting di-
vorces, such repeal would not affect the legal *status* of
married people in the least. They may be said to enter
into the marriage condition by contract; but after that
the contract vanishes.

Now, marriage is defined in section 55 of the Civil
Code of this state; and by that section, and not by the
Scotch or the Irish law, or the canon law of Europe, or
the common law of England (whatever it may be), must
the question here presented be determined. That section
is as follows:—

"SEC. 55. Marriage is a personal relation arising out
of a civil contract, to which the consent of parties capa-
ble of making it is necessary. Consent alone will not
constitute marriage; it must be followed by a solemniza-

tion, or by a mutual assumption of marital rights, duties, or obligations."

Here then, it is clearly, and beyond all controversy, provided, deliberately and expressly, that consent alone is *not* sufficient. The whole doctrine of a contract *per verba de præsenti* or *per verba de futuro cum copula* being a sufficient marriage is obliterated. In order to "constitute marriage," not as evidence merely, but as an essential part of the thing itself, the consent must be followed either by solemnization, or by the "assumption" of the marriage relation. And as in the case at bar there was no solemnization, the only question is, Was there an "assumption of marital rights, duties, or obligations," within the meaning of the language of the code?

The words of the language to be construed do not appear to have any well-defined "technical" meaning. Neither have they "peculiar" meaning in law. They do not occur in the statute law of any other state or country,—at least, we have not been referred to any which contain them. They are, therefore, to be construed, as stated in section 13 of the Civil Code, "according to the context and the *approved use of language.*" Now we venture to say that neither in the works of any standard author, nor in the common speech of intelligent people, can any instance be found where the word "assumption," or "assume," has been used in any sense consistent with— or in any sense other than repugnant to—the idea of concealment, denial, or repudiation. A man may assume to be that which he is not; but how can he, with any "approved use of language" be said to assume to be that which he denies himself to be? The etymological meaning of "assume" is to "take on." Among the definitions given by Webster are "to pretend to possess," "to take in appearance"; and, as synonyms, "arrogate," "usurp." Stormouth also gives the definition, "to pretend to possess"; and as synonyms, "affect," "pretend," "presume." Now, could any of these meanings be rightfully applied

to relations of men and women who sedulously, and *ex industria*, and in accordance with a prior contract, conceal those relations, and if charged with holding them, deny and repudiate their existence?

Moreover, in order to assume the marriage relation, there must be an assumption of that which is peculiar to that relation,—that which distinguishes it from all other relations. But mere secret sexual intercourse is not peculiar to marriage, and does not distinguish it from illicit sexual commerce. To call a horse " an animal with four legs" is to give no definition of a horse; and so to describe marriage, or the assumption of its rights, duties, and obligations, merely as secret copulation is to give no definition of marriage. How, therefore, can logic draw the conclusions that by the assumption of marital rights, duties, or obligations the legislature meant only the secret act referred to?

Again, what plainer or more obvious construction can be put upon the language in question than to say that the legislature meant by it that kind of conduct which generally, and we might say universally, characterizes married people who *have* assumed marital rights, duties, and obligations? The legislature must be presumed to have had that common knowledge which all people have of the familiar and habitual social customs of the country with respect to the marriage relation, and of the usual deportment of persons who have assumed that relation. Now, can it be pretended that married people usually (or at all) refuse to recognize each other as husband and wife in the presence of others; that they never speak of each other as husband and wife; that they never so live together that their residence, however humble,—though it be but a room in a garret,—is the recognized home of a family, with its usual relations and associations; that they so carefully guard their conduct that they are never reputed or even suspected among their acquaintances and friends to be husband and wife;

that they never indulge in any deportment whatever that would intimate in the slightest way to any human being, except themselves, that they were married? It seems difficult for any human understanding, not too much swayed by artificial distinctions and attentuated niceties, to receive such conduct as an "assumption of marital rights, duties, or obligations." What marital rights has a woman "assumed" who could not even protect herself against apparent shame by asserting the honorable name of wife? What marital obligation of protection can a man fulfill toward a woman whose wifehood he publicly repudiates? And how can society enforce its rights in a relation of which it can have no knowledge, and of the existence of which it has no grounds of suspicion? And what of the children, if any, of such a marriage? Is there to be no one whom they can call "father" or "mother"? And what possible protection could there be against fraudulent pretenses of marriages, — made, perhaps, for the first time after the deaths of alleged husbands or wives?

It argued that but little meaning can be attached to the language of the code because the word "open" is not used to qualify the word "assumption." It is possible that to some mental visions the adjective referred to might have made the meaning more satisfactory; just as some minds, perhaps, could not entirely grasp the idea conveyed by the word "ball," or "globe," unless it were accompanied by the word "round." But in either case the use of the adjective would be wholly superfluous, — *ferens ligna in sylva.*

When people assume the marital relation, the assumption becomes necessarily open. There is no need to have it proclaimed by the town crier, or placarded on the walls of the court-house. If they assume the marital relation, —and don't *deny* it,—no matter how quietly and modestly they may conduct themselves, and no matter how small may be their circle of friends, or how humble their

surroundings, the fact of the marriage will inevitably disclose itself.

Some confusion is sought to be thrown into the problem by the endeavor to give a peculiar and limited meaning to the word "consummation," as used in section 57 of the code. That section is as follows:—

"Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases."

And it is argued that "consummation" means simply sexual intercourse; and that, therefore, sexual intercourse, following consent, is all that the code requires to constitute a valid marriage. No doubt in some of the cases which hold that a contract *per verba de præsenti* or *per verba de futuro cum subsequente copula* constitutes a marriage, the *copula* is sometimes spoken of as the consummation. But the essential meaning of consummation is "the act of carrying to the utmost extent or degree; completion; termination; close; perfection." (Webster.) And its particular meaning, when used in connection with other language, must be gathered from the context. Now section 57 almost immediately follows section 55; and both sections are about the same subject. And as section 55 provides what must follow consent in order to make the marriage valid,—in order to give it "completion" and "perfection,"—no reasonable construction can be given to the two sections together, other than that "consummation" in the latter refers to the "completion," the "perfection" provided in the former; that is, the "assumption of marital rights, duties, or obligations." So that the meaning of these words last quoted is the sole question in this case, no matter from what direction we approach it.

It is impossible, within reasonable limits, to notice the various points made by counsel in the able and learned arguments, both oral and written, which they have pre-

sented to the court. For instance, it is argued very
forcibly that secret marriages, or secret attempts at
marriages, are against the policy of the law; and that,
therefore, the very contract relied on in this case as con-
stituting the marriage is, itself, absolutely void because
it enjoins secrecy. Section 75 of the code provides that
persons married without solemnization "must jointly
make a declaration of marriage"; and section 77 pro-
vides that "declarations of marriage must be acknowl-
edged and recorded in like manner as grants of real prop-
erty." It is true that a previous section of the same
article provides that "non-compliance with its provisions
does not invalidate any *lawful* marriage"; but, consider-
ing all the sections together, it is difficult to resist the
conclusion that the policy and intent of the code with
respect to unsolemnized marriages is, that they must
either be made matters of record, or that they must
be accompanied by such circumstances—such acts and
conduct of the parties—as will approximate that pub-
licity of which a record notice is the most complete evi-
dence; and that, therefore, a contract to enter upon the
marriage relation which provides for secrecy is void.
For if the relation between these parties was marriage,
then all marriages may be of that character; and society
might be undermined everywhere with such secret rela-
tions without there being one recognized wife or family
home in all the land. And it must be remembered that
the legislature adopted the code with the knowledge that
this court in *Graham* v. *Bennett,* 2 Cal. 506, speaking of
marriage, used this language: "If it takes place between
parties able to contract, an open avowal of the intention,
and an assumption of the relative duties which it im-
poses on each other, is sufficient to render it valid and
binding." But while we are strongly of the impression
that the contract relied on in this case is void on account
of its clause of secrecy, we are not called upon to hold
that if, notwithstanding said agreement for secrecy, the

parties had assumed the marital relation in the way hereinbefore indicated, there still would have been no marriage.

My conclusion is, that the facts found in this case did not, under the law of this state, constitute marriage; and that the judgment should be reversed, with directions to the superior court to enter judgment for defendant.

With respect to the appeal from the orders allowing alimony and counsel fees, as in my opinion there was no marriage, of course in my judgment those orders should be reversed.

Rehearing denied.